## CONSUMER PRODUCTS LICENSE AGREEMENT

This agreement ("Agreement") is entered into on this 1st day of March, 2003 and effective as of April 1, 2003 by and between Orange County Choppers, a limited liability corporation with its principal office at 27 Stone Castle Road, Rock Tavern, NY 12575 ("Licensor"), Bell Licensing LLC, a Connecticut limited liability corporation with a principal office located at 405 Silver Creek Lane, Norwalk, CT 06850 as agent for Licensor ("Agent") and Olaes Enterprises, Inc. d/b/a ODM, a California corporation with its principal office at 13860 Stowe Drive, Poway, CA 92064 ("Licensee"). In consideration of the promises and undertakings set forth below, and for other good and valuable consideration, the sufficiency of which are hereby established, Licensor, Agent and Licensee, each with the intent to be legally bound, hereby agree as follows:

1. Definitions. Unless the context otherwise requires, the following terms (in their singular or plural) as used in this Agreement will have the following meanings:

(a) The term "Advertising Materials" shall mean all advertising and promotional materials and all packaging, wrapping, and labeling materials for the Licensed Products (including, by way of illustration television, radio and Internet advertising, catalogs, trade advertisements, flyers, sales sheets, labels, package inserts, hangtags, and displays) which are produced by or for the Licensee and which make use of, reference and/or exploit the Licensed Products and/or Property.

(b) The term "Advertising Expenditures" shall have the meaning set forth in Paragraph 4(c).

(c) The term "Confidential Information" shall have the meaning set forth in Section 0.

(d) The term "Contract Year" shall have the meaning set forth in Paragraph 3.

(e) The term "Copyrights" shall mean all copyrights now or hereafter owned or controlled by Licensor relating to the Property.

(f) The term "Cross Licensing Opportunities" shall have the meaning set forth in Paragraph 2(e).

(g) The term "Counterfeit Goods" shall mean and include (i) any goods, materials, products or otherwise that bear any mark, logo, symbol, name or other distinctive or identifying indicia of the Property that have been reproduced or affixed without authorization from Licensor and/or Agent; (ii) goods that bear any mark, logo, symbol, name or other distinctive or identifying indicia of the Property produced for any source in excess of the amount ordered by Licensee or a designated channel of distribution; (iii) any goods that bear any mark, logo, symbol, name or other distinctive or identifying indicia of the Property that have been rejected, or never approved, by Licensor and/or Agent but have, nevertheless, entered into the stream of commerce; and (iv) any goods that are held over after the Sell-Off Period as defined in Section L(5).

(h) The term "Diverted Goods" shall mean any goods produced by someone acting on behalf of Licensee that are not delivered directly to Licensee or Licensee's designee.

(i) The term "Indemnified Persons" shall have the meaning set forth in Section H(1).

(j) The term "Immediate Year Projection" shall have the meaning set forth in Section B(3).

EXHIBIT 29

(k)     The term "Intellectual Property" shall mean Trademarks, Copyrights, and all other proprietary rights owned or controlled by Licensor relating to the Property which includes by way of example and not limitation any and all rights related thereto such as patents, trademarks, service marks, rights in design, trade or business names, copyrights (including future copyright and rights in the nature of or analogous to copyrights), get-up and topography rights, rights in inventions, know-how, trade secrets and other confidential information, rights in databases and all other intellectual property rights of a similar or corresponding nature which may subsist in any part of the world whether or not now existing and whether or not registered or registerable which includes any right to apply for registration of such rights and includes all renewals and extensions thereof.

(l)     The term "Licensed Products" shall collectively mean the use of the Property by Licensee, in a form and manner approved by Licensor and/or Agent in accordance with the terms hereof, on the following item:

T-Shirts – long and short sleeves + fleece, and jerseys, and caps and beanies
Kids & Adult Sizes:     Boys 4-7, Boys 8-20, All Adult Sizes in all models.

(m)     The term "Moral Rights" shall have the meaning set forth in Section E(6).

(n)     The term "Net Sales Price" shall mean Licensee's invoiced billing price to its customers and distributors for the Licensed Products less returns for damaged goods and trade volume discounts. In computing Net Sales, no direct or indirect expenses or costs incurred in connection with the payment of any royalties due under this Agreement (including any cost associated with transferring funds or converting currency into US Dollars) or in connection with the manufacture, sale, distribution, importing or advertising/marketing/promotion (including cooperative and other such similar advertising and/or promotional allowances) of the Licensed Products shall be deducted, nor shall any deduction be made for uncollectable accounts, cash discounts, early payment discounts, discounts relating to advertising or mark-down allowances.

(o)     The term "Official Tag(s)" shall have the meaning set forth in Section A(4).

(p)     The term "Parallel Goods" shall mean any Licensed Products transferred outside of the Territory or brought into the Territory in violation of this Agreement.

(q)     The term "Premiums" shall mean any product given free or sold at substantially less than its usual selling price (but not sales made pursuant to periodic price reductions resulting from "specials," "sales" or volume pricing discounts authorized by Licensor and/or Agent) for the purpose of increasing the sale of, or publicizing, any product or service, or for such other promotional purposes.  Premiums include: (a) self-liquidating offers; (b) use of Licensed Products as sales force or trade incentives; and (c) sales of Licensed Products through distribution schemes involving earned discounts or "bonus" points based on the consumer's use of the offeror's products or services.

(r)     The term "Property(s)" shall mean the Orange County Chopper logos, trademarks and controlled designs currently owned or controlled by Licensor, which includes any and all Intellectual Property inherent therein and appurtenant thereto.

(s)     The term "Promotions" shall mean lotteries, games of chance, sweepstakes or any such other contest or similar type of promotions.

-2-

EXHIBIT 29

(t)     The term "Sell Off Period" shall have the meaning set forth in Section L(5).

(u)     The term "Specs" shall have the meaning set forth in Section E(2).

(v)     The term "Territory" shall mean North America including USA, its territories and possessions

(w)     The term "Trademarks" shall mean all symbols, designs, styles, emblems, logos, and marks now or hereinafter owned or controlled by Licensor relative to the Property, including, but not limited to, the Orange County Choppers' logo.

(x)     The term "Transfer" shall have the meaning set forth in Section M(1).

(y)     The term "Work(s)" shall have the meaning set forth in Section E(3).

2.     Grant of License and Obligations of Licensee.

(a)     Grant of License.

(i) Licensed Products. During the term, as defined below, and only within the Territory, Licensor grants to Licensee, upon the terms and conditions set forth in this Agreement, the exclusive right and license to use the Property in connection with the manufacture, distribution, sale, and advertising of the Licensed Products through all channels of distribution. The rights and licenses granted by Licensor hereunder shall pertain only to those items specifically described and set forth in subparagraph 1(l) above entitled "Licensed Products."

(ii) Advertising Materials. During the term, as defined below, and only within the Territory, Licensor grants to Licensee, upon the terms and conditions set forth in this Agreement, the non-exclusive right and license to use the Property in connection with the design of Advertising Materials.

(b)     Prohibited Channels of Distribution. Licensee shall not sell, transfer or distribute the Licensed Products in any manner to any party or entity other than to a wholesaler or retailer, as those terms are customarily understood. Furthermore, Licensee shall not, without Licensor's prior approval, sell, transfer or distribute the Licensed products to any wholesaler, retailer or any other entity when Licensee knows or has reason to believe that the Licensed Products will ultimately be sold to the consumer by street vendors or by any such other non-conventional manner of distribution.

(c)     Continuity of Licensed Products. As a condition to the foregoing grant, it is understood and agreed that Licensee shall manufacture, produce, distribute and sell at least one (1) new version of each and every item set forth within the definition of Licensed Product each Contract Year of the Agreement.

(d)     Cross License Opportunities. Licensee acknowledges and agrees that Licensor is free to cross license its Property with any other item of intellectual property owned by a third party in any category now known or hereinafter developed other than the item categories that are specifically set forth within the definition of Licensed Products ("Cross License Opportunities") and the development of such Cross License Opportunities and the execution of license agreements relative thereto shall not be deemed a violation or breach of this Agreement in any manner whatsoever.

EXHIBIT 29

3.    Period of Agreement.  The period of this Agreement shall commence on April 1st, 2003 and end on December 31st, 2005 unless terminated earlier pursuant to the terms hereof ("Term"). Each individual year of the Agreement may also be referred to as a "Contract Year" (i.e. First Contract Year: 2003; Second Contract Year: 2004; Third Contract Year: 2005).

4.    Financial Commitments; Royalties.  In consideration for the rights granted to it under this Agreement, Licensee agrees to pay Licensor the following royalties:

(a)    Advance Royalties.  Upon execution of this Agreement, Licensee agrees to pay the following non-refundable Advance Royalty Amount, which shall be set off as a credit against the royalties due Licensor under subparagraph 4(b), to Agent on behalf of Licensor:

Advance Royalty Amount

US$ 7,500.00

If Agent has not received the Advance Royalty Amount by the date Licensee delivers to it a partially executed copy of this Agreement, then Licensor shall have the right, exercisable in its sole discretion, to terminate this Agreement, with immediate effect, by providing Licensee with written notice of termination.

(b)    Percentage Royalties.  Percentage royalties shall be computed as follows:

(i)    Licensee shall pay Licensor a percentage royalty of eight percent (8%) of the Net Sales Price on all mass market and lower, or ten percent (10%) of the Net Sales Price on all other distribution of the Licensed Products by Licensee to its customers or distributors.

(ii)    All royalty computations under this subparagraph 4(b) shall be made on the basis of whichever of the following calculations of Net Sales Price would be greater, as determined in the event of a conflict in Licensor's sole discretion:  the Net Sales Price charged by Licensee to a subsidiary or other party controlled by Licensee, **or,** if Licensee sells a Licensed Product to a subsidiary or other party controlled by Licensee, on the basis of the Net Sales Price for such Licensed Product charged by such subsidiary or controlled party on the resale of the Licensed Product.

(c)    Minimum Guaranteed Royalties.  Licensee shall pay Licensor a Minimum Guaranteed Royalty Amount (as set forth below) during the Term of this Agreement.

Minimum Guaranteed Royalty Amount

Seventeen Thousand Five Hundred US Dollars (US $ 17,500.00)

5.    Agent's Limited Participation and Involvement in the Administration of this Agreement.  The parties acknowledge and agree that Agent's participation in this Agreement is limited to that of an administrator for this licensing arrangement on behalf of Licensor, which includes but is limited to assisting in the facilitation of the Licensed Product approval functions set forth herein between Licensor, Licensee and the collection of royalty payments and statements due hereunder and certain other duties as specifically set forth herein.

-4-

EXHIBIT 29

6.   <u>Standard Terms and Conditions</u>. This Agreement is subject to all of the provisions of the Standard Terms and Conditions attached to the Agreement, and by this reference it is understood and agreed that all of the provisions of the attached Standard Terms and Conditions are hereby incorporated into the Agreement and made a part hereof as if such provisions were fully set forth at length herein.

7.   <u>Acknowledgment by the Parties</u>. The parties by executing this Agreement acknowledge that they have reviewed and understand all provisions of the Agreement, including the attached Standard Terms and Conditions. To that end, each party has reviewed the terms and conditions of the Agreement with their respective attorneys and, as a direct result thereof, have participated in the drafting of the Agreement. It is therefore understood and agreed that the language of the Agreement shall not be presumptively construed in favor or against any party hereto. Based on the foregoing, the parties have executed the Agreement with the consent and acknowledgement of their attorneys.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date set forth above.
AGREED to and ACCEPTED BY:

Orange County Choppers
("LICENSOR")

By: _____

Date: 2/21/2003

ODM
("LICENSEE")

By: _____
EMIL CLAES

Date: 3-13-03

EXHIBIT 29

CONSUMER PRODUCT LICENSE AGREEMENT
STANDARD TERMS AND CONDITIONS

SECTION A. QUALITY CONTROLS AND APPROVAL PROCEDURES FOR LICENSED PRODUCTS AND ADVERTISING MATERIALS.

A(1)    Warranty of Quality.  Licensee warrants, represents and guarantees that: (a) the Licensed Products will be of good quality in design, material, and workmanship and will be suitable for their intended purpose; (b) no injurious, deleterious or toxic substances will be used in or on the Licensed Products; (c) the Licensed Products will not cause harm when used as instructed and with ordinary care for their intended purpose; and (d) the Licensed Products will be manufactured, sold and distributed in strict compliance with all applicable laws, regulations and industry standards.  Licensee will not ship, sell, distribute or have its manufacturer(s) ship, sell or distribute any Licensed Products or component parts of Licensed Products containing the Property (or any portion thereof) if they are damaged, defective, irregular, seconds or otherwise unacceptable to Licensor and/or Agent.

A(2)    Approval Procedures for Licensed Products and Advertising Materials; Approval Standards; Time for Approval by Agent on behalf of Licensor.

(a)    General.  Before exploiting the Licensed Products in any manner whatsoever pursuant to the terms of this Agreement, Licensee will comply with all standards and procedures which Licensor and/or Agent may from time to time adopt regarding the approval of the Licensed Products and the Advertising Materials. These approval procedures will be implemented using prescribed forms supplied to Licensee by Agent (or on forms customarily used by Licensee and approved by Agent) and will incorporate, at a minimum, the basic approval requirements and steps outlined in this Section.  Licensee will retain all materials relating to this approval process in its files during the Term and for one (1) year thereafter.

(b)    Approval of Licensed Products.  With respect to every Licensed Product including each type, style and design of the Licensed Product which Licensee proposes for commercial production and distribution under this Agreement, Licensee will, using the forms referenced above and at no charge to Licensor or Agent, submit to Agent for Licensor's review and approval, the following documentation in the order stated:

STEP 1:  Design Stage - Submission of finished art or final proofs for the Licensed Product at issue, showing the exact use of the Property on or in connection with such proposed Licensed Product;

STEP 2:  Production Stage - Upon approval of STEP 1, and immediately upon commencement of production, the provision of ten (10) identical production samples of the Licensed Product at issue. Upon request by Licensor and/or Agent, Licensee may also from time to time be required to furnish to Licensor or Agent, free of charge, up to five (5) additional pieces of the Licensed Products in order to promote them (i.e. for Licensor's/Agent's display rooms, advertisements, trade shows and other such Licensor/Agent promotional forums as determined in their sole and absolute discretion) or for comparison with earlier samples of such Licensed Products.

Licensee will comply with each and every step of the foregoing approval process for each Licensed Product and will obtain Licensor's written approval at each step, unless by prior written notice from Licensor it is

-6-
EXHIBIT 29

exempt from any such step with respect to a specific Licensed Product. Licensor reserves the right to request to running changes.

(c)     Approval of Advertising Materials. With respect to each different item of Advertising Material which Licensee, or any party acting on its behalf, proposes to produce and use under this Agreement, Licensee will, using the forms referenced above, submit to Agent for Licensor's review and approval the following documentation, in the order stated:

STEP 1:  Design Stage - submission of a final pre-production design sample of the Advertising Material at issue, where feasible (as, for example, in the case of labels, hangtags, printed brochures, and catalogs);

STEP 2:  Production Stage - Upon approval of STEP 1, and immediately upon commencement of production, Licensee will provide five (5) final production samples of the Advertising Material at issue.

Licensee will not be permitted to use the Property in any Advertising Materials, or in any other similar manner, without the prior written approval of Licensor.

(d)     Approval Standards. Licensor and Agent shall have the right to disapprove any materials submitted to it under Sections A(2)(b) or A(2)(c) if it determines, in its sole and unfettered discretion, that the materials in question would impair the value and goodwill associated with the Property or Licensor's licensing program for the Property, by reason of (i) their failure to satisfy the general quality standards including those set forth in Section A(1); (ii) their use of artwork, designs, or concepts which fail to accurately depict the Property; (iii) their use of materials which are unethical, immoral, or offensive to good taste; (iv) their failure to carry proper copyright, trademark or other required notices; or (v) any other reasonable cause.

(e)     Time for Approval by Licensor/Agent. Licensor/Agent agree to use reasonable efforts to notify Licensee in writing of its approval or disapproval of any materials submitted to it under Sections A(2)(b) and A(2)(c) within fifteen (15) days after its receipt of such materials, and agree, in the case of its disapproval, to notify Licensee in writing of its reasons for disapproval. In the event Licensor fails to approve or disapprove of any materials submitted as provided for above within twenty (20) days after Licensor's receipt of such materials from Agent, the materials shall be automatically deemed disapproved.

(f)     Limitations on Approval. Licensee acknowledges that Licensor's approval of any item of Licensed Product described in this Agreement does not imply approval of any of the non-Licensor controlled elements contained on, upon or within any such item of the Licensed Product. Licensor's approval of any Licensed Product will not be construed in any way as an acknowledgement that such Licensed Product is in compliance with the warranty of quality asserted by Licensee in Section A(1) or that such Licensed Product is in compliance with any applicable laws, regulations and industry standards. The review of production samples, designs and prototypes of the Licensed Products during the approval process by Licensor or Agent is required for the sole purpose of monitoring Licensee's adherence and compliance with internal policies and procedures of Licensor concerning the Property and the brand, including the look, depiction, quality and style of the Licensed Products. With regard to the Licensed Products' compliance with any particular warranties, whether express or implied and including the warranties of quality asserted in Section A(1), or any and all applicable laws, regulations and industry standards, it is understood that Licensor and Agent will rely solely and exclusively on the representations and warranties of Licensee set forth under this Agreement.

-7-
EXHIBIT 29

(g)     Revocation of Approval. In the event that: (i) the quality, appearance, material or style of any Licensed Product ceases to meet standards previously approved by Licensor; (ii) Licensee uses the Property in an improper or unauthorized manner or violates any of the terms of this Agreement; or (iii) there is an occurrence or factor connected with any such Licensed Product which, in the opinion of Licensor or Agent, reflects unfavorably upon the professional or business reputation of Licensor and/or the Property, then, in such event, Licensor and/or Agent will have the right, in their sole and absolute discretion, to immediately withdraw or revoke its approval for such Licensed Product. In the event of such withdrawal or revocation, Licensor will provide immediate written notice to Licensee and Licensee will, upon receipt of said notice, cease the use of the Property (or portion thereof) in connection with the sale, distribution, advertisement or use of such Licensed Product and such Licensed Product will immediately be withdrawn from the market and destroyed. In the event of revocation of an approval pursuant to this Section, Agent, Licensor and Licensee will then negotiate, in good faith, for a reasonable sell-off period, if possible, for such Licensed Product. If there are other Licensed Products for which approval has not been withdrawn or revoked pursuant to this Section, this Agreement will remain in full force and effect as to such other Licensed Products. Licensee will provide written confirmation to Licensor/Agent that any Licensed Products have been promptly and properly deleted from Licensee's product lines.

A(3)     Maintenance of Quality of Licensed Products; Inspection of Production Facilities. Licensee agrees to maintain the quality of each Licensed Product manufactured under this Agreement up to the specifications, quality, and finish of the production sample of such Licensed Product originally approved by Licensor under Section A(2)(b), and agrees not to change the Licensed Product in any respect or to make any change in the artwork for the Licensed Product without first submitting to Agent samples showing such proposed changes and obtaining Licensor's written approval of such samples. Licensee shall also furnish to Agent and/or Licensor upon request the addresses of the production facilities used by Licensee for manufacturing the Licensed Products, and shall make arrangements for Agent, Licensor or its and their representatives to inspect such production facilities during reasonable business hours.

A(4)     Display of Official Licensed Product Hologram Tags and Labels. If directed by Licensor or Agent during the Term hereof, Licensee will attach to each Licensed Product or its container a hologram tag, label, or sticker bearing the words "Officially Licensed Orange County Choppers Product" or "Authentic Licensed Orange County Choppers Product" in a form prescribed or approved by Licensor or Agent ("Official Tag"). If so directed, Licensor will provide Licensee with the Official Tag(s). Licensee shall not provide the Official Tags to any third party for any purpose whatsoever, without the prior written approval of Licensor. Upon the request of Licensor or Agent, Licensee will furnish reports evidencing the use of Official Tags with sales of Licensed Products. In addition to the labeling requirements set forth in this Section and as required by then applicable government authorities such as required by the Federal trade Commission, Licensee will also cause its own name to appear on each Licensed Product or each Licensed Products' container on a tag or label in a form prescribed or approved by Licensor or Agent.

A(5)     Miscellaneous.

(a)     Photographs for Licensed Products. If Licensee requests Licensor or Agent to furnish it with any photographs incorporating the Property (e.g., photographs, slides or otherwise), Licensee will pay Licensor or Agent, as the case may be, a fee for supplying such materials to Licensee in accordance with then current Licensor policy and procedures. Notwithstanding the foregoing, Agent will provide Licensee free of charge one (1) CD-ROM art bank of certain Intellectual Property on or about the execution of this Agreement

-8-
EXHIBIT 29

(b)     Translations.  All translations of written material used on or in connection with the Licensed Products or Advertising Materials will be accurate and, to the extent a word or phrase does not have an applicable translation, the English word or phrase will be used.  In all other circumstances Licensee, when submitting the Licensed Products and the Advertising Materials for approval, will provide Agent with translations of all such written materials in English.

(c)     Use of Property in Endorsements, etc.  Without prior written consent of Licensor, Licensee will not be allowed to use any of the Property for the purpose of an explicit endorsement of Licensee or any of Licensee's services or other products.

(d)     Transactions with Other Licensees.  Licensee will not, without Agent's prior written consent, (i) sell or deliver to another Licensor licensee the films or other devices used by Licensee to produce the Licensed Products, or (ii) print or otherwise produce any items using the Property for another Licensor licensee.

(e)     Licensor's Right to Purchase Licensed Products.  In addition to the production samples of the Licensed Products to be supplied by Licensee to Licensor free of charge under Section A(3), Licensor and Agent will be entitled, during the Term, to purchase from Licensee any available quantity of the Licensed Products as may be reasonably available at Licensee's most favored nations' wholesale price and, in the case of a manufacturer's closeout, such inventory must first be offered to Licensor and/or Agent at no more than one hundred and ten percent (110%) of Licensee's cost of manufacture.

(f)     Use of Property on Licensee Business Forms.  The Property will not be preprinted by Licensee on its stationery, envelopes, business cards, invoices, statements, packing slips or other similar documents or materials unless approved in advance in writing by Licensor or Agent.

(g)     Expenses Chargeable to Agent or Licensor.  Licensee will not incur or create any expense chargeable to Agent or Licensor without their prior written approval.


SECTION  B.     EFFORTS  TO  SELL  LICENSED  PRODUCTS;  REPORTING  REQUIREMENTS; RESTRICTIONS ON SALE.

B(1)     Efforts to Design and Manufacture the Licensed Products.  Licensee will manufacture the Licensed Products at Licensee's own expense in sufficient quantities to meet the reasonably anticipated demands of the trade, the industry and the general public.

B(2)     Efforts to Distribute the Licensed Products.

(a)     Distribution Arrangements.  Licensee will make and maintain adequate arrangements for the distribution and timely delivery of Licensed Products solely to wholesalers and retailers within and throughout the Territory.  In addition, Licensee will give the Licensed Products wide distribution and, in accordance with the selling practices set forth in this Agreement and consistent with Licensee's customary criteria and reasonable business judgment, will not refrain from selling Licensed Products to any particular channel of distribution within the Territory (unless otherwise prohibited or restricted herein) that may desire to purchase Licensed Products whose credit rating and marketing image warrants such sale.

EXHIBIT 29

(b) <u>No Discrimination Between Licensed Products and Products of Third Parties</u>. In the event Licensee sells or distributes other licensed merchandise of a similar grade or quality as the Licensed Products, Licensee will not discriminate between the Licensed Products and the licensed products of any third party, in a manner which adversely impacts the Licensed Products in the granting of commissions and discounts to salesmen, dealers and distributors. Licensee may not package the Licensed Products in combination with other products without the prior written approval of Agent or Licensor.

B(3) <u>Efforts to Market, Promote or Advertise the Licensed Products; Submission of Marketing Plans.</u>

a)        (a) <u>Reasonable Efforts</u>. Subject to the terms of Section B(5) below, Licensee will exercise reasonable efforts to advertise, market and promote the Licensed Products at its own expense and will use its best efforts to sell the Licensed Products in the Territory.

b)        (b) <u>Promotion of Property.</u> In furtherance of such efforts, Licensee agrees that it will incorporate, where possible, information associated with the Property, as directed by Licensor and/or Agent, on all Advertising Materials, including any packaging, product inserts and wrapping materials for the Licensed Products.

(c) <u>Marketing Plans</u>. As a means of monitoring and reporting on such efforts, Licensee will provide Licensor and Agent, within ninety (90) days of the execution of this Agreement, and on or before the expiration of each Contract Year during the Term of this Agreement, with a written marketing plan. Each such marketing plan will include sales objectives and estimated projections for the Licensed Products.

B(4) <u>Selling Practices</u>. Licensee acknowledges Licensor's legitimate and reasonable interest in protecting the value of the Property and maximizing the effectiveness of Licensor's advertising, promotion and distribution efforts by segmenting the classes of trade into which its licensees sell. Therefore, In addition to and in further support of Paragraph 2 (b) above, Licensee will only sell the Licensed Products to a buyer that, to its best knowledge, (a) purchases Licensed Products from Licensee solely for sale directly to the consumer and operates a retail establishment that supports the high quality and image of Licensor and the Licensed Products with appropriate merchandising displays, promotions and customer service, and (b) sells to retailers that support the high quality and image of Licensor and the Licensed Products with appropriate merchandising displays, promotions and customer service. Licensee acknowledges that failure to comply with the selling practices set forth in this Section will cause significant harm to Licensor's efforts to effectively and efficiently distribute Licensor related licensed products.

B(5) <u>Restrictions on the Marketing, Promotion, Advertising and Sale of the Licensed Products.</u>

(a) <u>Prohibition Against Premiums</u>.. Licensee will not use the Licensed Products as a Premium in any form or manner without the prior written approval of Agent. In each instance in which approval may be given, it is understood that a separate Licensor premium agreement will be entered into between the parties. Nothing in this Agreement will prohibit Licensee from marketing Licensed Products using creative techniques upon written notice to, and approval of, Agent consistent with industry practice including periodic specials, sales, or volume discount prices. Should Licensee undertake such marketing, all receipts must be accounted for in net sales and in the royalty payments/statements required by this Agreement. Any and all rights related to Premiums, as they concern the Licensed Products, are specifically reserved by and for Licensor's use and Licensor will have the right to exploit such Premiums, without any compensation to Licensee and without Licensor, or any third party affiliated with Licensor, being in breach of any of the terms

EXHIBIT 29

of this Agreement. At Licensor's request, Licensee will provide Licensed Products to Licensor or another entity as requested by Licensor for use in Licensor -initiated Premium programs at a price which is twenty percent (20%) less than wholesale price.

(b)    <u>Promotions; Sweepstakes for the Licensed Products</u>.  Under no circumstances will Promotions be permitted in connection with the Licensed Products without the advance written approval of Agent. In the event Agent approves such Promotions for Licensee, it is understood that Licensee will be responsible for: (i) compliance with all Federal, State and local rules and regulations concerning the Promotions; (ii) implementation and administration of the Promotion including collection of any and all the entries related to the Promotion, the selection of the winners and awarding the prizes; and (iii) the completion of any such other element of the Promotions in order to ensure its fulfillment.

(c)    <u>Prohibition Against Modifying Licensed Products</u>. Licensee will not knowingly manufacture, sell or distribute the Licensed Products for or to any party or entity which changes, alters, or adds to the Licensed Products in any manner whatsoever with the intent to resell or distribute the Licensed Products to retailers, wholesalers, vendors or the general public, unless approved in advance in writing by Licensor.

B(6)    <u>Compliance</u>.

(a)    <u>Legal and Ethical Standards</u>. Licensee will manufacture, sell, promote, advertise and distribute the Licensed Products in a legal and ethical manner and in accordance with the terms and intent of this Agreement, which includes for the avoidance of doubt compliance and conformance with the highest standards of employment practice then applicable concerning employee wage and benefits, employee working hours, child labor, forced labor, harassment or abuse, discrimination, freedom of association and health and safety.

(b)    <u>Anti-Counterfeiting System</u>. Licensee will, at all times, comply with all applicable laws, government rules and regulations, court and administrative decrees and the highest standard of business ethics then prevailing in the industry. In addition to the foregoing, Licensee will at all times faithfully comply with and adhere to Licensor's hologram "Official Licensed Product" identification system or such other shipment tracking, identification and anti-counterfeiting systems, tags and labels that Licensor may establish from time to time, which at a minimum is initially set forth in Section A(4) above. Licensee will use its best efforts to ensure that all designated entities purchasing Licensed Products comply with the Licensor anti-counterfeiting systems and labels now established or subsequently amended by Licensor.

(c)    <u>Governmental Approvals</u>. It will be Licensee's sole responsibility, at its own expense and in connection with its performance under this Agreement, to obtain all approvals (including approvals of certain Licensed Products and Advertising Materials) from all necessary governmental authorities. To that end, Licensee shall (i) comply with all laws, regulations and standards relating to or pertaining to the manufacture, sale, advertising or use of the Licensed Products and Advertising Materials; and (ii) comply with the requirements of any regulatory agencies (including without limitation the United States Consumer Product Safety Commission and Federal Trade Commission) which shall have jurisdiction over the Licensed Products and Advertising Materials.

(d) <u>Counterfeit Goods, Diverted Goods and Parallel Goods</u>. Licensee will use its best efforts to prevent the re-creation of any Counterfeit Goods, Diverted Goods or Parallel Goods involving the Property by its employees, agents, representatives or any others operating under its direction, supervision or control. Licensee will use its best efforts to ensure that the Licensed Products are sold only within the Territory and only to an end user. Licensee will periodically, and at the request of Licensor and/or Agent, inquire of its

authorized distributors, agents and customers as to whether they are observing territorial limits and will periodically report in writing to Licensor and Agent the results of such inquiries. Licensee will immediately notify Licensor and Agent of any and all incidents of suspected counterfeiting. If Licensee actually knows that any Licensed Product sold by Licensee is being resold outside the Territory or is being sold as Counterfeit Goods, Diverted Goods or Parallel Goods, Licensee will be responsible for and liable to Licensor for such counterfeiting actions and Licensee shall compensate Licensor for the injury to its licensing and distribution program and will pay all costs and expenses, including attorney's fees, required to remove such goods from the marketplace or permanently restrain Licensee's customers from further unauthorized sale of Licensed Product.

SECTION C. ROYALTIES; STATEMENTS.

C(1)    Computation of Royalties. All royalties due Licensor will accrue upon the sale of the Licensed Products, regardless of the time of collection by Licensee. The date of sale will be determined by the following:

(1) Consumer Sales. For the purpose of this Agreement, a Licensed Product will be deemed "sold" to a consumer on the date on which Licensee receives payment for the Licensed Product or the date on which the Licensed Product is invoiced or shipped by Licensee (or its agent, distributor or representative) to the customer. For the purposes of determining the timing of receipt of payment the following will apply: (A) any payment made by credit card or debit card will be deemed to be received on the date on which authorization for the credit transaction was given to Licensee, regardless of when the funds were actually deposited in or credited to Licensee's account; and (B) any payment made by check, money order or cash will be deemed received on the date on which Licensee receives such check, money order or cash, regardless of the date on which any such check or money order was subsequently deposited or otherwise presented for payment by Licensee. Licensee will be solely responsible for all risks associated with any payments made by credit card, debit card, check or money order that are subsequently dishonored or invalidated due to insufficient funds, lack of cardholder authorization or any other similar cause. Licensee will not be entitled to take any reductions or credits against net sales based on such events.

(2) Sales to Wholesaler or Distributor. For the purpose of this Agreement, a Licensed Product will be deemed "sold" to a wholesaler or distributor as of the date on which such Licensed Product is billed or invoiced.

C(2)    Time of Payment. Licensee shall pay all royalties owing to Licensor under this Agreement in accordance with the payment schedule set forth in paragraph 4 of this Agreement and/or as otherwise directed in Section C(5) below. All royalty amounts in this Agreement are stated in U.S. Dollars, and all royalty payments shall be made in U.S. Dollars. All royalty statements required to be submitted by Licensee shall accompany the royalty payments made to Licensor.

C(3)    Licensor Approval of Discounted Sales. If Licensee proposes to sell any Licensed Product at a price which is less than then ten percent (10%) above Licensee's manufactured cost of such Licensed Product, Licensor shall have a right of prior approval over the terms of such sale and the percentage royalty to be payable by Licensee to Licensor under paragraph 4 with respect to such sale.

C(4)    Deductions; Taxes.

(a)    There shall be no deduction from the royalties owed to Licensor for uncollectible accounts, or for taxes, fees, assessments, or other expenses of any kind which may be incurred or paid by Licensee in connection with: (i) royalty payments to Licensor or Agent on behalf of Licensor; (ii) the manufacture, sale,

EXHIBIT 29

distribution, or advertising of the Licensed Products in the Territory; or (iii) the transfer of funds or royalties or the conversion of any currency into U.S. Dollars. It shall be Licensee's sole responsibility at its expense to obtain the approval of any foreign authorities; to take whatever steps may be required to effect the payment of funds from abroad; to minimize or eliminate the incidence of foreign taxes, fees, or assessments which may be imposed; to protect its investments in foreign territories; to enable it to commence or continue doing business in any foreign territory; and to comply in any and all respects with all applicable laws and regulations.

        (b)    Notwithstanding the provisions of the preceding Section C(4)(a), if (i) any country imposes a withholding tax against Licensor or Agent on behalf of Licensor with respect to the royalties payable to by Licensee on sales of the Licensed Products in such country, (ii) such tax is paid by the Licensee on behalf of Licensor, and (iii) such tax is an income tax as to which a foreign tax credit is allowable to Licensor under Section 901 of the Internal Revenue Code of 1986, as amended, Licensee may deduct the amount of such withholding tax from the royalties then due and owing to Licensor on the condition that the Licensee furnishes to Licensor and Agent such information as Licensor/Agent requires to evidence Licensor's right to credit such withholding tax against its federal income tax liability in the United States.

        C(5)    Royalty Statements. Licensee shall furnish to Agent (on forms approved by Licensor and Agent) within thirty (30) days after the close of each and every calendar quarter during the Term hereof, along with any royalty payments then due, if any, a full and complete statement, duly certified by an officer of Licensee to be true and accurate, showing the number of each type of Licensed Product sold during the calendar quarter in question, the total gross sales revenues for each such Licensed Product, an itemization of all allowable deductions, if any, the Net Sales Price for each Licensed Product sold and the amount of royalties due with respect to such sales together with such other pertinent information as Licensor or Agent may reasonably request from time to time. There shall be a breakdown of sales of Licensed Products by country, and all figures and monetary amounts shall first be stated in the currency in which the sales were actually made. If several currencies are involved in any reporting category, that category shall be broken down by each such currency. Next to each currency amount shall be set forth the equivalent amount stated in U.S. Dollars, and the rate of exchange used in making the required conversion calculation. All computations and payments will be in U.S. Dollars at the spot rate for the local currency as published in the Wall Street Journal for the last business day of the preceding month.

        C(6)    Royalty Statements; Rights Reserved. The receipt or acceptance by Licensor or Agent on behalf of Licensor of any royalty statements furnished pursuant to this Agreement, or the receipt or acceptance of any royalty payments made, shall not preclude Licensor or Agent from questioning their accuracy at any time.

        C(7)    Method of Payment. Along with the submission of the accompanying royalty statements during the Term, Licensee will submit to Agent on behalf of Licensor payment of any and all royalties then due, as set forth in this Agreement, by check payable to "Bell Consulting, LLC on behalf of Orange County Choppers" delivered directly to Agent at the address indicated on page 1.

        C(8) Books of Account and Other Records; Audits. Licensee will keep accurate books of account and records covering all transactions relating to the rights and licenses granted under this Agreement including sales of Licensed Products, and the purchases and uses of Licensor hologram hangtags. Licensee will also keep accurate books of account and records of its compliance with any and all shipment tracking, identification, anti-counterfeiting systems and labels that Licensor may establish from time to time. Licensor and its Agent's independent royalty auditor will have the right, at all reasonable hours of the day and upon reasonable prior notice, to examine and audit such books of account, documents and records, including records of Licensee's parent, subsidiaries, affiliates and third parties, relating to the exploitation of the Licensed Products described in this Agreement. The independent royalty auditor will have free and full access to such

EXHIBIT 29

records for auditing purposes and for the purpose of making extracts and copies. At the independent royalty auditor's request, Licensee will provide an authorized employee to assist in the examination of Licensee's records. Should an audit initiated by Licensor or Agent establish a deficiency between the amount found to be due Licensor and the amount Licensee actually paid or reported, Licensee will pay: (a) the amount of such deficiency (including past due royalties) and (b) interest on the overdue royalty amount at the lower of one and one-half percent (1 1/2 %) per month (eighteen percent (18%) per annum) or the highest amount permitted by law, on the gross sum of the unpaid amount from the date such amount should have been paid until the date of payment. If the deficiency is equal to or greater than ten percent (7 1/2%), Licensee shall also be responsible for reimbursement to Licensor for the costs of conducting such audit. Licensee will pay any amounts due as a result of an audit, including the cost of the audit (if appropriate), within thirty (30) days after receipt of a demand for payment by Licensor or Agent. All such books of account and records maintained by Licensee, its parent, affiliate or subsidiary companies will be kept available for at least two (2) years after the expiration or termination of this Agreement. In order to facilitate inspection of its books and records, Licensee will designate a symbol or number which will be used exclusively in connection with the Licensed Products on which royalty payments are payable and will maintain, for inspection purposes, duplicates of all billings to customers with respect to the Licensed Products.

### SECTION D. TRADEMARK PROTECTION.

D(1)    Trademark Uses Inure to Licensor's Benefit. Licensee recognizes the exclusive right of Licensor to all Property and will not use such Property in any manner or for any reason except as expressly contemplated by this Agreement. All uses of the Property by Licensee will inure to the exclusive benefit of Licensor, which will own all rights, including trademark rights, created by such uses of the Property, together with the goodwill of the business in connection with which such trademarks are used.

D(2)    Trademark Registrations. Licensor will have the exclusive right, but not the obligation, to file at its own expense trademark applications relating to the use or proposed use by Licensee of any of the Property in connection with the Licensed Products. Any and all such filings will be made in the name of Licensor. Licensee will execute all documents and perform such other acts as Licensor may deem necessary to secure, perfect, or record Licensor's or its designee's trademark rights. Licensee and its employees, agents, contractors, and representatives will not, (a) oppose, petition to cancel, or otherwise contest Licensor's trademarks, trademark applications, or trademark registrations, or (b) challenge Licensor's ownership of or the validity of Licensor's trademarks, trademark applications, or trademark registrations. The provisions of this Section will survive any termination or expiration of this Agreement.

D(3)    Records Relative to Trademark Uses. Licensee will keep appropriate records, including copies of pertinent invoices and correspondence, of the date each Licensed Product is first placed on sale or sold in each country of the Territory, and the dates of first use in each country of every different element of the Property on the Licensed Products and Advertising Materials. If requested to do so by Licensor, Licensee, at its own expense, will supply Licensor with samples of the trademark usage in question and other information which will enable Licensor to complete and obtain trademark applications or registrations, or to evaluate or oppose any trademark applications, registrations, or uses by other parties. The provisions of this Section will survive any termination or expiration of this Agreement.

D(4)    Registered User Laws. As to those countries which require applicants to register Licensee as a registered user of a Trademark or other element of the Property used on or in connection with the Licensed Products, or which require the recordation of this Agreement, Licensee will execute and deliver to

Licensor such documents as may be required by Licensor for such purposes. Failure to do so will be considered a breach of this Agreement and may be cause for its termination.

D(5) <u>Trademark Notices</u>. Licensee will affix, or cause its authorized manufacturing sources to affix, to the Licensed Products and to the Advertising Materials such trademark notices as specified in Section 11 or as otherwise directed in writing by Licensor.

### SECTION E. COPYRIGHT PROVISIONS.

Licensor and Licensee acknowledge and agree that to the extent that Licensee's graphic designs, including, but not limited to, the creative elements contained therein can be separated from Licensor's Property, Licensee shall retain ownership of the graphic designs and/or creative elements; however, if such graphic designs created by Licensee cannot be separated from Licensor's Property, Licensor shall own the graphic designs.

### SECTION F. REPRESENTATIONS AND WARRANTIES.

F(1) <u>Licensor's Representation and Warranty</u>

Licensor represents and warrants that: (a) it is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized; (b) it has the full right, power, legal capacity and authority to enter into this Agreement, carry out the terms of this Agreement and grant Licensee the rights and privileges granted under this Agreement; (c) it is the owner or entity that controls the Property granted under this Agreement; (d) it has the authority to license the Property under this Agreement; (e) it has such other exploitation rights granted in this Agreement; (f) in any of the foregoing instances, such rights will be unencumbered, unpledged, unattached; and (g) no agreements or unilateral claims exist which might affect a control over the rights sold and granted to Licensee under this Agreement. Furthermore, Licensor warrants that the rights granted in this Agreement will not violate or infringe upon the rights of any third persons or parties.

F(2) <u>Licensee's Warranty & Representation</u>

Licensee represents and warrants that: (a) it is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it was incorporated, and (b) it has full right, power, legal capacity and authority to enter into this Agreement and to carry out the terms of this Agreement.

F(3) <u>Agent's Warranty and Representation</u>

Agent represents and warrants that: (a) it is a limited liability company duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is organized; (b) it has the full right, power, legal capacity and authority to enter into this Agreement, carry out the terms of this Agreement as Agent representing Licensor in the administration of this licensing arrangement; and (c) no agreements or unilateral claims exist which might affect Agent's ability to perform the terms and conditions of this Agreement.

-15-
### EXHIBIT 29

SECTION G.    INDEMNIFICATIONS; PRODUCT LIABILITY INSURANCE; LIMITATION OF LIABILITY/DAMAGES.

G(1)    Licensee's Indemnification. Licensee will be solely responsible for and will indemnify, defend and hold Licensor and Agent and their respective officers, directors, members and employees harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting there from, including reasonable attorneys' fees arising from or by reason of or in connection with the manufacture, distribution, importation, advertising, promotion, offering for sale and sale of the Licensed Products or any breach of this Agreement by Licensee.

G(2)    Licensor's Indemnification. Licensor will be solely responsible for and will indemnify, defend and hold Agent and Licensee and their respective officers, directors, members and employees harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fees (but specifically excluding lost profits or consequential damages and such other such similar losses itemized under Section G (7) below) made by third parties against Licensee based on a claim of right in one or more elements of the Property or a claim for trademark infringement or any breach of this Agreement by Licensor.

G(3)    This Section is intentionally left blank.

G(4)    Claims Procedures.  With respect to any claims falling within the scope of the foregoing indemnifications: (a) each party agrees promptly to notify the other of and keep the other fully advised with respect to such claims and the progress of any suits in which the other party is not participating; (b) each party shall have the right to assume, at its sole expense, the defense of a claim or suit made or filed against the other party; (c) each party shall have the right to participate, at its sole expense, in any suit instituted against it and to approve any attorneys selected by the other party to defend it, which approval shall not be unreasonably withheld or delayed; and (d) a party assuming the defense of a claim or suit against the other party shall not settle such claim or suit without the prior written approval of the other party, which approval shall not be unreasonably withheld or delayed.

G(5)    Product Liability Insurance. Licensee will obtain and maintain during thTerm of this Agreement, at its own expense, comprehensive general liability insurance policy which will include coverage for product liability and advertising related claims from an insurance company which maintains an A.M. Best rating of at least A- (A minus) or higher and is acceptable to Licensor and/or Agent providing protection at a minimum, in the amount of One Million US Dollars (US $1,000,000) per occurrence, Three Million US Dollars (US$3,000,000) annual aggregate applicable to any claims, liabilities, damages, costs, or expenses, including attorneys' fees, arising out of the exploitation of the Licensed Products by Licensee.  Such insurance will include coverage of Licensor, Agent and its and their members, directors, officers, agents and employees. Such insurance will remain in full force and effect at all times during the Term and for a period of two (2) years thereafter.  Within thirty (30) days after execution of this Agreement by Licensor and again within thirty (30) days of the policy's renewal date, Licensee will cause the insurance company issuing such policy to issue a duplicate original certificate to Licensor and Agent naming Licensor and Agent as additional insureds. The insurance policy will also contain an endorsement that the insurance coverage will not be reduced, modified or cancelled without Licensee and the insurance company providing thirty (30) days prior written notice to Licensor and Agent.  In the event that Licensee's product liability insurance lapses, or if at any time Licensor and/or Agent are not covered by insurance in accordance with provisions set forth in this Agreement, or if any

-16-
EXHIBIT 29

other provision of this Section is breached, Licensor will have the right to immediately terminate this Agreement.

G(6)  DISCLAIMER. LICENSOR AND AGENT DISCLAIM ALL WARRANTIES, EXPRESS OR IMPLIED, RELATIVE TO THE IMPLIED WARRANTIES OF MERCHANTABILITY AND THE IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE.

G (7)  Equitable Relief.  Licensee acknowledges that Licensor is entering into this Agreement not only in consideration of the royalties paid, but also for the promotional value, goodwill and intrinsic benefit resulting from the manufacture, distribution, sale and promotion of the Licensed Products by Licensee within the Territory.  Licensee further acknowledges that the Property possesses a special, unique and extraordinary character that cannot be replaced or the loss of which cannot be adequately compensated for in money damages.  Licensee further acknowledges that any breach by Licensee of this Agreement will cause irreparable injury and harm to Licensor.  Therefore, if it is alleged by Licensor, Agent or any third party affiliated with Licensor, that (a) Licensee has failed to manufacture, distribute, market, promote and/or sell the Licensed Products in strict accordance with the terms of this Agreement, or (b) Licensee has used the Property in an unauthorized manner, as may be determined by Licensor in its sole and absolute discretion, Licensor, Agent, any third party affiliated with Licensor and/or its assignees (in addition to any other remedies that may be available to them under this Agreement or other such applicable laws) will have the right to obtain from any court having jurisdiction such equitable relief as may be appropriate, including such necessary injunctive relief, without the necessity of posting a bond or other security or proving actual damages.

SECTION H.  RESERVATION OF RIGHTS.

H(1)  Reservation of Rights.  Except for the specific rights granted to Licensee under Section 2 of this Agreement, all rights in and to the Property, including any Premium rights related to the Licensed Products, are retained by Licensor for its own use and exploitation, including the right to license and exploit said rights (or portions thereof) to third parties for their exploitation.  Licensee will not acquire any rights whatsoever in the Property as a result of its use under this Agreement and all uses of the Property will inure to Licensor's benefit.  Licensor reserves the right to use, and to license other parties to use, the Property within the Territory for any purpose Licensor may determine in its sole and absolute discretion. Licensor will retain all rights not expressly and exclusively conveyed in this Agreement and Licensor may license firms, individuals, partnerships or corporations to use the Property in conjunction with other products.

H(2)  Goodwill.  Licensee recognizes the great value of the publicity and goodwill associated with Licensor and the Property and acknowledges that such goodwill belongs exclusively to Licensor.  Licensee further recognizes that the Property has acquired a secondary meaning in the minds of the purchasing public.  Licensee will not, during the Term of this Agreement or thereafter, attack the property rights of Licensor in and to the Property or attack the validity, legality or enforceability of this Agreement.

SECTION I.  INFRINGEMENTS; CLAIMS.

I(1)  Infringements. Representations and Warranties by Licensee.  Licensee represents and warrants to Licensor and Agent that all designs and products submitted for approval (other than the Property itself) are not subject to any valid patent, copyright, trademark or such other proprietary rights of any third party.  It is understood that Licensor and Agent will not be liable for, and Licensee will fully indemnify, defend and hold Licensor and Agent harmless from: (a) any activities of Licensee under this Agreement that

-17-
EXHIBIT 29

may infringe or are alleged to infringe upon any patent, copyright, trademark (other than the Property itself) or such other proprietary rights belonging to any third party; (b) any damages or costs involved in any proceeding based upon such infringement or alleged infringement; or (c) any royalty or obligation incurred by Licensee because of any patent, copyright, trademark or other proprietary interest held by a third party, other than claims based solely upon a right to or in one or more elements of the Property.

(c). **Infringements.** When Licensee learns that a party is making unauthorized use of the Property, Licensee will promptly give Licensor and Agent written notice that will supply Licensor and Agent with full information regarding the actions of such party. Licensee will not make any demands or claims, bring suit, effect any settlements, or take any other action against such party without the prior written consent of Licensor and/or Agent. Licensee will cooperate with Licensor in connection with any action taken by Licensor and Agent to terminate infringements.

(d). **Claims.** If: (a) claims or suits are made against Licensor or Licensee by a party asserting ownership of rights in a trademark, name or design which is the same as or similar to one of the elements of the Property; (b) that the use of a particular element of the Property by Licensee infringes the rights of such party; or (c) if the parties learn that another party has or claims rights in a trademark, name or design which would or might conflict with the proposed or actual use of an element of the Property by Licensee, Licensor and Licensee will, in any such case, consult with each other on a suitable course of action. In no event will Licensee have the right, without the prior written consent of Licensor and/or Agent, to acknowledge the validity of the claim of such party, to obtain or seek a license from such party, or to take any other action which might impair the ability of Licensor to contest the claim of such party if Licensor so elects in its sole and absolute discretion. Licensee will, at the request of Licensor and/or Agent make any and all reasonable modifications requested by Licensor in Licensee's use of the Property in question or discontinue use of such element in the country or the territory in question in regard to the Licensed Product(s) which are involved if Licensor and/or Agent, in their sole and absolute discretion, determines that such action is necessary or desirable to resolve or settle a claim or suit or eliminate or reduce the threat of a claim or suit by such party. Licensor will have the right to fully participate, at its own expense, in the defense of any claim or suit instituted against Licensee with respect to the use by Licensee of an element of the Property.

(e). **Assistance in Protection of the Property.** Licensee will, at its own expense, cooperate to the fullest extent necessary to assist Licensor and Agent in the protection of Licensor's rights in and to the Property. Licensee will cooperate with Licensor and Agent in its enforcement efforts including being named by Licensor as a complainant in any action against an infringer. Licensee will pay Licensor, and waives all claims to, all damages or other monetary relief recovered in any such Licensor-initiated action by reason of a judgment or settlement (other than for reasonable attorneys' fees and expenses incurred at Licensor's request) that represent or are intended to represent injury sustained solely by Licensor. With respect to any damages, if any, recovered relative to injuries sustained solely by Licensee, Licensee will be entitled to receive such damages but will pay to Licensor royalties on any such amounts intended to represent Licensee's compensation attributable to lost sales for the Licensed Products.

## SECTION  SUBLICENSING OF RIGHTS; AGREEMENTS WITH MANUFACTURERS.

(1) **Sublicensing.** Licensee shall not have the right to sublicense any of the rights granted to it under this Agreement.

(2) **Agreements with Manufacturers.** Licensee shall not contract with any party for the production of the Licensed Products or the application/use of the Property by that party unless Licensor and/or

-18-
**EXHIBIT 29**

Agent provides prior written authorization. In the event that Licensee desires to have a manufacturer produce one or more Licensed Products, or any component thereof, Licensee shall provide Licensor and Agent with the name, address and telephone number of the principal contact of the proposed manufacturer. Furthermore, Licensor and Agent must approve any manufacturer in writing prior to its use of the Property in any manner whatsoever. In addition, Licensee shall take all steps necessary to ensure the following: (i) manufacturer produces the Licensed Products only as and when directed by Licensee, with Licensee remaining at all times fully responsible for ensuring that the Licensed Products are manufactured in accordance with the terms herein including without limitation compliance with the approval process; (ii) manufacturer does not distribute sell or supply the Licensed Products to any person or entity other than Licensee; (iii) manufacturer does not delegate in any manner whatsoever its obligations with respect to the Licensed Products. To that end, Licensee agrees to enter into a written agreement, in a form and manner approved by Licensor and Agent, with all such manufacturers and Licensee agrees to incorporate into such written agreements all of the provisions which are required to fully protect the rights of Licensor and Agent, which includes by way of example and not limitation compliance and conformance with the highest standards of employment practice then applicable concerning employee wage and benefits, employee working hours, child labor, forced labor, harassment or abuse, discrimination, freedom of association and health and safety. Licensee further agrees to furnish Licensor and Agent within thirty (30) days of their execution copies of all agreements with such manufacturers. Failure to comply with any aspect of this section is a material breach and Licensor shall have the right to immediately terminate this Agreement.

J(3)    Enforcement of Manufacturer Agreements.  Licensee agrees strictly to enforce against its manufacturers all of the provisions which are required to be included in such agreements for the protection of Licensor and Agent, as provided in Section J (2); to advise Licensor and Agent of any violations thereof by manufacturers and of corrective actions taken by Licensee and the results thereof; and at the request of Licensor and/or Agent to terminate such an agreement with any manufacturer which violates any of Licensor's and/or Agent's rights in and to the Property.  If Licensee fails to exercise such termination rights by giving written notice to the manufacturer within twenty (20) days after being requested to do so in writing by Licensor and/or Agent, Licensee appoints Licensor and /or Agent its irrevocable attorney-in-fact to send a notice of termination in the name of Licensee to the manufacturer for the purpose of terminating the agreement or any specific rights of the party under such agreement.

J(4)    Shipment of Licensed Products.  Licensee shall not engage in the direct shipment of offshore manufactured Licensed Products to distributors, wholesalers, retailers, etc. Licensee must take receipt of the Licensed Products at applicable U.S. or Canadian ports of entry.

SECTION K.  BREACH AND TERMINATION.

K(1) Right Of Termination

(a)    Immediate Right of Termination.  In addition to the termination rights stated elsewhere in this Agreement, Licensor and Agent will have the right to terminate this Agreement immediately by giving written notice to Licensee, in any of the following situations:

(i)    Within three (3) months of the execution of this Agreement by Licensor, Licensee has failed to take any good faith steps to fully exploit the rights granted to it under this Agreement (for example, failing to submit designs concepts for approval as set forth in Section A);

-19-
**EXHIBIT 29**

(ii)     Within six (6) months from the date that this Agreement is executed, Licensee will have not have begun the bona-fide distribution and sale of the Licensed Products within and throughout the Territory in accordance with this Agreement;

(iii)     If Licensee makes, sells, offers for sale, distributes or uses any Licensed Product or Advertising Material without having the approval of Agent, as required by Section A, or makes any use of the Property not authorized under this Agreement;

(iv)     If Licensee fails to deliver to Licensor and Agent or fails to maintain full force and effect the insurance referenced to in Section H of this Agreement;

(v)     If Licensee substantially discontinues its business in the manner as it is now conducted;

(vi)     If Licensee fails to deliver, in a timely manner, any statements or notices referred to in this Agreement (other than any royalty statements which are controlled by Section L(1)(b)) or fails to give Licensor, Agent or their authorized representatives access to the premises or licensing records for the purposes permitted under this Agreement;

(vii)     If Licensee exhibits a pattern of repeated failure to make timely delivery of sufficient quantities of the Licensed Products to vendors within its approved channels of distribution that results in: (a) the inability of retailers to meet consumer demand and materially affects the generation of royalties payable to Licensor, or (b) causes an adverse effect to the Licensor licensing program. This clause will not be applicable to a failure to make timely delivery because of an event of force majeure or an unexpected, unplanned demand, so long as all reasonable efforts are made by Licensee to resume timely delivery as soon as possible;

(viii)     If Licensee knowingly: (a) delivers Licensed Products outside the Territory; (b) sells Licensed Products to a third party where Licensee knows that such third party delivers or sells the Licensed Products outside the Territory; (c) sells Licensed Products to a third party where Licensee has good and sufficient reason to know that such third party delivers the Licensed Products outside the Territory (and provided Licensee does not promptly cease delivery to such third party after it should have reasonably ascertained such party's intent, or after receiving notice of such party's transshipping); or (d) Licensee improperly distributes the Licensed Products to retailers or distributors outside of the scope of its channels of distribution as set forth in Section 2;

(ix)     If Licensee sells to any third party that Licensee knows is altering or modifying the Licensed Products prior to sale to the ultimate customer;

(x)     If any governmental agency or court of competent jurisdiction finds that the Licensed Product(s) are defective in any way, manner or form, including being subject to any voluntary or involuntary order of any governmental agency (e.g., US Consumer Product Safety Commission, Federal Trade Commission) involving the recall of any of the Licensed Products due to safety, health or other hazards or risks to the public or the failure to comply with statutory labeling and notice requirements for the Licensed Products;

(xi)     If, other than under Title 11 of the United States Code: (a) Licensee becomes subject to any voluntary or involuntary insolvency, cession, bankruptcy, or similar proceedings; (b) Licensee

EXHIBIT 29

makes an assignment for the benefit of creditors; (c) an agreement between Licensee and its creditors generally is entered into providing for extension or composition of debt; (d) a receiver is appointed to administer the assets of Licensee; (e) the assets of Licensee are liquidated; or (f) any distress, execution, or attachment is levied on such of its manufacturing or other equipment as is used in the production and distribution of the Licensed Products and remains undischarged for a period of thirty (30) days;

(xii)    If Licensee fails to comply with the terms and notice requirements of Sections D, I and J as set forth in this Agreement; and

(xiii)    If Licensee discloses any Confidential Information concerning this Agreement, as defined in Section 0), which, it acknowledges, it may become privy to during the Term of this Agreement.

(b)    Right to Terminate upon 5 Days Written Notice (one time curable breach only). If Licensee fails to make any Advance Royalty Payment or percentage royalty payment by the date such payment is required to be due under the provisions of Section 4 and/or Section C(5) or if Licensee fails to submit royalty statements or royalty payments to Agent or Licensor during the time period specified in Section C(5) within five (5) days after receipt of a default notice from Agent or Licensor, then Agent and/or Licensor will have the right to terminate this Agreement and Licensee will not have the right to cure any subsequent late or overdue royalty payment or royalty statement failures under this Section.

(c)    Right to Terminate upon 30 Days Written Notice (curable breach). If Licensee breaches any other terms and provisions of this Agreement including any representation, warranty, or agreement made by it under this Agreement, other than those specifically itemized in Sections K (1)(a) (i)-(xii) or K (1)(b), and Licensee fails to cure the breach within thirty (30) days after receiving written notice by certified or registered mail from Licensor and/or Agent specifying the particulars of the breach, then Licensor and/or Agent will have the right to terminate this Agreement by giving written notice to Licensee by registered or certified mail.

K(2)    Assumption and Rejection Pursuant to United States Bankruptcy Code. After any order for relief under the Bankruptcy Code is entered against Licensee, Licensee must assume or reject this Agreement within sixty (60) days after the order for relief is entered. If Licensee does not assume this Agreement within such sixty (60) day period, Licensor and/or Agent may, in its sole and absolute discretion, terminate this Agreement immediately by giving written notice to Licensee, without further liability on the part of Licensor or Agent. In the event Licensee assumes this Agreement, it is understood and agreed that Licensee will be and shall remain responsible for all monies that come due Licensor under this Agreement, including without limitation any past due monies or debts that Licensee failed to pay Licensor or Agent prior to, during or after the filing for bankruptcy protection or relief under the Bankruptcy Code.

K(3)    Effect of Termination. Termination of this Agreement under the provisions of Section K(1), or any other provisions set forth in this Agreement, will be without prejudice to any rights or claims which Licensor may otherwise have against Licensee. Upon the termination of this Agreement for any reason whatsoever, it is understood that the following events will occur immediately: (a) all royalties on sales made by Licensee previous to the date of termination will become immediately due and payable to Agent on behalf of Licensor, and (b) all minimum guarantees, if any, outstanding on the date of termination will become immediately due and payable to Agent on behalf of Licensor. Upon termination of this Agreement, Licensee, its receivers, trustees, successors, assignees, or other representatives will have no right whatsoever to sell, exploit, or in any way deal with the Licensed Products, the Advertising Materials and/or the Property.

EXHIBIT 29

K(4)   Discontinuance of Use of Intellectual Property, etc.   Subject to the provisions of Section K (5), upon the expiration or earlier termination of this Agreement, Licensee will immediately and permanently: (a) discontinue manufacturing, selling, advertising, distributing, and using the Licensed Products and Advertising Materials; (b) discontinue using the Property; (c) destroy any Specs, films, molds, dies, CD's, electronic data files, patterns, or similar items from which the Licensed Products and Advertising Materials were made where any element of the Property is a part; and (d) terminate all agreements with manufacturers, distributors, and others which relate to the manufacture, sale, distribution, and use of the Licensed Products.

K(5)   Disposition of Inventory Upon Expiration.   If this Agreement expires in accordance with its terms, and is not terminated for cause by Licensor, the provisions of this Section will apply.   Licensee shall deliver to Licensor or Agent thirty (30) days prior to the expiration of this Agreement, a certificate showing written inventory listings on a Licensed Product-by-Licensed Product basis all Licensed Products in Licensee's possession, custody, or control as of the date of such inventory. Licensee will have the non-exclusive right to sell any Licensed Products listed on such inventory for a period of ninety (90) days immediately following the expiration of the then existing Term of this Agreement, subject to the timely payment of royalties due Licensor on any such sales in accordance with the terms of this Agreement ("Sell Off Period").   The Sell Off Period will, in no event, apply to any quantity of Licensed Product exceeding fifty percent (50%) of Licensee's average quarterly unit sales of such Licensed Product during the one (1) year period immediately preceding the expiration of this Agreement.  Licensor and Agent will have the option for any reason whatsoever to conduct physical inventories of the Licensed Products at Licensee's warehouse at anytime prior to the expiration of this Agreement and continuing through the end of any Sell Off Period.   If Licensee refuses to permit such physical inventory, Licensee will forfeit its right to dispose of its inventory during the Sell-Off Period.   After such Sell Off Period, all inventory on hand or in process, including all promotional, advertising and packaging materials will be destroyed.

SECTION L.  MISCELLANEOUS PROVISIONS.

L(1)   Restriction on Assignments.   Without the prior written consent of Licensor and/or Agent, which consent may be withheld in their sole discretion, Licensee will not, directly or indirectly, assign, sublicense, hypothecate, convey, pledge, encumber or otherwise transfer ("Transfer") any of its rights under this Agreement, except as otherwise expressly provided in this Agreement.

L(2)   Independent Contractor Relationship.   At all times the parties to this Agreement will be considered independent contractors and this Agreement will not create an agency, partnership or employment relationship between the parties.   Nothing contained in this Agreement will be construed so as to make the parties' partners or joint venturers or to permit Licensee to bind Licensor or Agent to any agreement or purport to act on behalf of Licensor or Agent in any respect. Other than as specifically set forth herein, nothing contained in this Agreement will be construed so as to make Agent, Licensor, Licensee or any combination thereof partners or joint venturers or to permit the parties to bind the other to any agreement or purport to act on their behalf in any respect unless otherwise set forth herein.

L(3)   Modifications of Agreement; Remedies.   No waiver or modification of any of the terms of this Agreement shall be valid unless in writing, signed by both parties.   Failure by either party to enforce any rights under this Agreement shall not be construed as a waiver of such rights, and a waiver by either party of a default in one or more instances shall not be construed as a continuing waiver or as a waiver in other instances.

EXHIBIT 29

L(4)    No Waiver of Termination Rights. (a) The waiver, express or implied, by Licensor or Agent of any rights under this Agreement; or (b) Licensor's and/or Agent's failure to perform or act upon a provision of this Agreement will not constitute or be deemed a waiver of any other right under this Agreement or be deemed to be a breach of this Agreement and such right will be exercisable when it is deemed appropriate by Licensor and/or Agent.

L(54)    Invalidity of Separable Provisions. If any portion of this Agreement is held by any court or other tribunal of competent jurisdiction to be illegal, invalid, void or unenforceable in such jurisdiction, the remainder of such provision will not be affected and will be given full effect, without regard to such illegal, invalid, void or unenforceable portion. It is the intention of the parties that if any court construes any portion of this Agreement to be illegal, invalid, void or unenforceable in such jurisdiction the remainder of such provision will not be affected and will be given full effect without regard to such portion. It is intention of the parties that if any court construes any portion of this Agreement to be illegal, void or unenforceable because of the duration of such provision or the area or matter covered by the provision such court will reduce or modify the duration or matter of such provision accordingly. If any term or provision of this Agreement is for any reason held to be invalid, such invalidity shall not affect any other term or provision, and this Agreement shall be interpreted as if such term or provision had never been contained in this Agreement.

L(65)    Notices. All notices to be given under this Agreement will be in writing and will be delivered either by personal delivery, regular mail, overnight courier, or facsimile provided that a copy of such notice is also given by mail on the same day at the respective addresses of the parties as set forth below, unless notification of a change of address is given in writing. Notice given by regular mail will be deemed given on the date of the mailing and notice given by facsimile will be deemed given on the date of confirmation of receipt of such facsimile provided a copy of such notice is also sent by regular mail:

Notices to Licensor:    · To the address set forth on page 1

With a copy to Agent:   To the address set forth on page 1

Notices to Licensee:    To the address set forth on page 1

With a copy to Licensee's attorney:    Jay S. Kopelowitz, 101 West Broadway, Ste. 1950, San Diego, CA 92101; Fax: 619. 231-2846.

M(76)    Headings. The paragraph and section headings of this Agreement are inserted only for convenience and shall not be construed as a part of this Agreement.

L(87)    Entire Understanding. This Agreement constitutes the entire agreement between the parties respecting the subject matter of this Agreement and supersedes any and all prior agreements or understandings between the parties with respect to the subject matter of this Agreement, whether written or oral.

L(98)    Governing Law. This Agreement will be governed by, and construed in accordance with, the laws of the State of Connecticut applicable to contracts entered into and to be fully performed in Connecticut.

L(10)    Jurisdiction. The parties will submit solely to the jurisdiction of a United States District Court located in the State of Connecticut and/or the State Courts of the State of Connecticut located in Fairfield County in the State of Connecticut.

L(11)  No Third Party Beneficiaries.  Unless otherwise stated to the contrary in this Agreement, there are no intended third party beneficiaries to this Agreement.

L(12)  Counterparts.  This Agreement may be executed in several counterparts, each of which will be deemed an original and all of which will together constitute one and the same instrument. However, this Agreement shall not be in effect unless all parties hereto have executed this Agreement.

L(13)  Binding Effect.  The parties represent and warrant that the person executing this Agreement has the authority to bind the party on behalf of which he/she is signing.

L(14)  Rules of Construction.  As used in this Agreement, unless the context otherwise requires (a) references to "Sections" are to sections of this Agreement; (b) all "Exhibits" referred to in this Agreement are to Exhibits attached to this Agreement and are incorporated into this Agreement by reference and made a part of this Agreement; (c) "include", "includes" and "including" are not deemed to be followed by "without limitation" unless specifically followed by such words or words of like import; (d) the singular includes the plural, and (e) the masculine, feminine and neutral genders include the others.

## SECTION M: FORCE MAJEURE

If any party is prevented from performing its obligations under this Agreement as a result of a force majeure event, then the non-performing party will not be liable to the other parties for its failure to perform such obligations.  As used in this Agreement, force majeure will mean any act of God, fire, flood, war, public disaster, other calamity, strike, or labor difficulties, or any governmental determination, action, regulation, or order, or any other occurrence beyond the reasonable control of the non-performing party, which, despite the non-performing party's reasonable efforts, prevents the performance of its obligations under this Agreement.  Licensee will be responsible for the continued payment of all royalties due Licensor as set forth in Section 4 and/or Section C(5) during any force majeure.  Upon the resolution of that force majeure event, Licensee will resume its remaining obligations (i.e., all other obligations other than payment) as set forth in this Agreement and/or proceed as otherwise directed by Licensor or Agent, as determined in their sole discretion.

## SECTION N: CONFIDENTIAL INFORMATION

N(1)  During the Term of this Agreement, each of the parties may have access to confidential information of the other ("Confidential Information").  Confidential Information for the purposes of this Agreement will be defined to include, software (regardless of the stage of development), designs, drawings, specifications, models, technical information, unreleased or undisclosed Property, hardware, source codes, object codes, documentation diagrams, flow charts, marketing and development plans, business plans, or records, financial information, market reports, customer lists, talent lists, storylines, scripts, story boards or ideas, employee lists, business manuals, policies and procedures, the terms and conditions of this Agreement, billing information and procedures and all other information.  The parties will, during the Term and for a period of five (5) years after the expiration or termination of this Agreement, for any reason whatsoever, hold each other's Confidential Information in confidence, employing the same degree of care that the party employs for its own proprietary information.  The parties will not make each other's Confidential Information available in any form to any third party or use each other's Confidential Information for any purpose other than for the implementation or exploitation of this Agreement.

**EXHIBIT 29**

N(2) <u>Non-Confidential Information</u>. Notwithstanding the foregoing, the parties' obligations of confidentiality will not include information which:

(i) at the time of disclosure was in the public domain;

(ii) after such disclosure, becomes generally available to the public other than through any act or omission by the party releasing said information; and

(iii) is required to be disclosed by any court of competent jurisdiction, provided that prior written notice of such disclosure is furnished to Licensee in a timely manner in order to afford Licensee an opportunity to seek a protective order against such disclosure and the disclosure is strictly limited to the information which the party is required or compelled to disclose.

**BY INITIALING ON THE SPACES INDICATED BELOW, THE PARTIES HERETO ACKNOWLEDGE AND AGREE TO THE PROVISIONS OF THIS STANDARD TERMS AND CONDITIONS AND CONSENT TO ITS INCORPORATION INTO THE AGREEMENT:**

LICENSOR: _____

DATE: _3/21/2003_

AGENT: _____

DATE: _3/20/03_

LICENSEE: _____

DATE: _3-13-03_

EXHIBIT 29

## AMENDMENT TO CONSUMER PRODUCTS
## LICENSE AGREEMENT DATED MARCH 1, 2003

THIS AMENDMENT is made with reference to that certain Consumer Products License Agreement dated March 1, 2003 and effective as of April 1, 2003 by and between Orange County Choppers, a limited liability company having its principal office at 27 Stone Castle Road, Rock Tavern, New York 12575 (hereinafter referred to as "LICENSOR"), Bell Licensing LLC, a Connecticut limited liability company with a principal office at 405 Silver Creek Lane, Norwalk, Connecticut 06850 as agent for LICENSOR (hereinafter referred to as "AGENT") and Olaes Enterprises, Inc. d/b/a ODM, a California corporation having its principal office at 13860 Stowe Drive, Poway, California 92064 (hereinafter referred to as "LICENSEE").

WHEREAS, LICENSOR desires to receive royalties and royalty statements required by Section C of the Consumer Products License Agreement on a monthly basis; and

WHEREAS, LICENSEE is willing to pay such royalties and provide royalty statements required by Section C of the Consumer Products License Agreement on a monthly basis.

NOW, THEREFORE, in consideration of the premises, mutual promises and covenants contained herein, the parties agree as follows:

Section C(5) on Page 13 of the Consumer Products License Agreement shall be amended so that royalty statements and royalty payments shall be furnished to AGENT within thirty (30) days after the close of each and every calendar month during the Term.

Except as amended herein, all of the other terms and conditions of the Consumer Products License Agreement shall be in full force and effect. In the event of any inconsistency, incongruity or conflict, the terms and conditions of this document shall prevail.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed effective as of July 30, 2003. This Amendment may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one document binding on all parties. Each of the parties agrees that a photographic or fax copy of the signature evidencing a party's execution of this Amendment shall be effective as an original signature and may be used in lieu of the original for any purpose.

LICENSOR:
ORANGE COUNTY CHOPPERS

By: _____
Paul Teutul, Sr., Member

LICENSEE:
OLAES ENTERPRISES, INC. dba ODM

By: _____
Anthony V. Olaes, President

AGENT:
BELL LICENSING LLC

By: _____
James Bell, Member

Page 1 of 1

EXHIBIT 29

August 02, 2004

Olaes Enterprises d/b/a ODM
13860 Stowe Drive
Poway, CA 92064
Attn: Tony Olaes

Re: Second Amendment to Consumer Product Licensee Agreement between Orange County Choppers and Olaes Enterprises d/b/a ODM

Dear Mr. Olaes:

Reference is hereby made to that certain consumer product license agreement between Orange County Choppers ("Licensor") and Olaes Enterprises d/b/a ODM ("Licensee") dated March 1, 2003, as amended by a First Amendment dated March 1, 2003 and any prior contracts, amendments or modifications related thereto in full force and effect as of the date hereof (collectively the "Agreement"). In consideration of the mutual promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree to amend the Agreement effective as of August 15, 2004 as follows ("Second Amendment"):

1. The parties agree to note the typographical error in the preamble of the Agreement that referred to Orange County Choppers, the Licensor herein, as a limited liability corporation and by this reference hereby agree to amend and change the Agreement to identify the proper contracting entity as "Orange County Choppers, Inc." in the preamble and throughout the remainder of the Agreement.

2. The parties further agree that the Agreement shall be amended so that the term "Licensee" shall mean Olaes Enterprises, Inc. d/b/a ODM, a California corporation, and ODM Apparel ULC, a Canadian unlimited liability corporation, provided the following conditions are met:

    a) That only Olaes Enterprises, Inc. d/b/a ODM has the right to and license to manufacture, distribute, sell and advertise the Licensed Products in the United States of America, its territories and possessions and Mexico; it being further intended that only ODM Apparel ULC will have the right and license to manufacture, distribute, sell and advertise the Licensed Products in Canada; and
    b) that at all times, all payments, debts, obligations, promises, representations and warranties of the Licensee as provided for under this Agreement are assumed by Olaes Enterprises, Inc. d/b/a ODM and ODM Apparel ULC jointly and severally.

3. The parties further agree as follows: Section 1(l) on page 2 of the Agreement shall be amended by removing "caps & beanies" from the definition of Licensed Products.

4. The parties further agree to add the following subparagraph (e) entitled "Licensor Reserved Channels of Distribution" to Paragraph 2 entitled "Grant of License and Obligations of Licensee":

    "(e)    Licensor Reserved Channels of Distribution: Notwithstanding anything to the contrary herein (and unless approved in advance in writing by Licensor), the rights granted to Licensee by Licensor under this Agreement shall not include the right to sell, distribute, manufacture, market, display and/or advertise the Licensed Products through any of the following Licensor reserved channels of distribution; (i) Licensor attended competitions, trade shows, exhibits or events, which includes but is not limited to the Sturgis Bike Week, the Daytona Beach Bike Week and any other such similar bike rallies or events; (ii) Licensor catalogs (mail order or otherwise); (iii) Trackside at NASCAR, NHRA or other such similar racing competitions; (iv) Licensor direct mail sales channels; (v) Licensor owned or controlled television, Internet or other electronic media now known or hereinafter discovered, which includes without limitation the Licensor owned and controlled Internet website currently known as www.orangecountychoppers.com. To that end, it is understood and agreed that Licensor has retained and reserved the right and license to and may, as determined in Licensor's sole and absolute discretion, sell, distribute, market, display and/or advertise products, including products similar to or identical to the Licensed Products as defined

1

EXHIBIT 29

herein, through any or all of the aforedescribed Licensor reserved channels of distribution and any such activities undertaken by Licensor or its designated representatives shall not be considered a breach or violation of the terms of this Agreement in any manner whatsoever. Furthermore, the parties specifically agree that all such sales by Licensor or its designated representatives, including any and all sales that date back to March 1, 2003, through the Licensor Reserved Channels of Distribution shall not be considered a breach or violation of the terms of this Agreement in any manner whatsoever.

5. The parties agree to amend and replace in its entirety paragraphs L (98) and L (10) of the Agreement with the following provisions:

"M(98)  Governing Law. This Agreement will be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts entered into and to be fully performed in New York.

M(10)  Jurisdiction. The parties will submit solely to the jurisdiction of a United States District Court located in White Plains, New York and/or the State Courts of the State of New York located in Orange County in the State of New York."

6. Except as amended herein, all of the other terms and conditions of the Agreement shall remain in full force and effect. In the event of any inconsistency, incongruity or conflict with the terms of the Agreement, the terms and conditions of this Second Amendment shall prevail.

7. This Second Amendment may be executed on one or more counterparts, each of which shall be an original, but all of which together shall constitute one document binding on all parties. Each of the parties agrees that a photographic or fax copy of the signature evidencing a party's execution of this Second Amendment shall be effective as an original signature and may be used in lieu of the original or any purpose.

Please confirm your acceptance of the terms of this Second Amendment to the Agreement as set forth above by **signing** each of the (3) originals in the space provided below and returning each of the original documents to my attention. One fully executed copy will be returned to you for your files. Thank you in advance for your prompt attention to this matter.

Very Truly Yours,
C. Scott Amann

AGREED AND ACCEPTED the terms of this Second Amendment dated August 02, 2004:

Olaes Enterprises, Inc. d/b/a ODM                    Orange County Choppers, Inc
("Licensee")                                                              ("Licensor")

By: _____                    By: _____

Print Name: ANTHONY V. OLAES          Print Name: Paul Teutl, SR

Title: PRES. & CEO                                          Title: Pres.
Date: 8/5/04                                                      Date: 8/26/04

ODM Apparel LLC ("Licensee")
By: _____

Print Name: ANTHONY V. OLAES

Title: PRES. & CEO
Date: 8/5/04

2

EXHIBIT 29

## AMENDMENT TO CONSUMER PRODUCTS
## LICENSE AGREEMENT DATED MARCH 1, 2003

THIS AMENDMENT is made with reference to that certain Consumer Products License Agreement dated March 1, 2003 and effective as of April 1, 2003 by and between Orange County Choppers, a limited liability company having its principal office at 27 Stone Castle Road, Rock Tavern, New York 12575 (hereinafter referred to as "LICENSOR"), Bell Licensing LLC, a Connecticut limited liability company with a principal office at 405 Silver Creek Lane, Norwalk, Connecticut 06850 as agent for LICENSOR (hereinafter referred to as "AGENT") and Olaes Enterprises, Inc. d/b/a ODM, a California corporation having its principal office at 13860 Stowe Drive, Poway, California 92064 (hereinafter referred to as "LICENSEE").

WHEREAS, LICENSOR desires to receive royalties and royalty statements required by Section C of the Consumer Products License Agreement on a monthly basis; and

WHEREAS, LICENSEE is willing to pay such royalties and provide royalty statements required by Section C of the Consumer Products License Agreement on a monthly basis.

NOW, THEREFORE, in consideration of the premises, mutual promises and covenants contained herein, the parties agree as follows:

Section C(5) on Page 13 of the Consumer Products License Agreement shall be amended so that royalty statements and royalty payments shall be furnished to AGENT within thirty (30) days after the close of each and every calendar month during the Term.

Except as amended herein, all of the other terms and conditions of the Consumer Products License Agreement shall be in full force and effect. In the event of any inconsistency, incongruity or conflict, the terms and conditions of this document shall prevail.

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed effective as of July 30, 2003. This Amendment may be executed in one or more counterparts, each of which shall be an original, but all of which together shall constitute one document binding on all parties. Each of the parties agrees that a photographic or fax copy of the signature evidencing a party's execution of this Amendment shall be effective as an original signature and may be used in lieu of the original for any purpose.

LICENSOR:                                    LICENSEE:
ORANGE COUNTY CHOPPERS                        OLAES ENTERPRISES, INC. d/b/a ODM

By: _____                 By: _____
   Paul Teutul, Sr., Member                        Anthony V. Olaes, President

AGENT:
BELL LICENSING LLC

By: _____
   James Bell, Member


Page 1 of 1

EXHIBIT 29

July 14, 2005

Olaes Enterprises d/b/a ODM
13860 Stowe Drive
Poway, CA 92064
Attn: Tony Olaes

Re: Third Amendment to Consumer Product Licensee Agreement between Orange County Choppers and Olaes Enterprises d/b/a ODM

Dear Mr. Olaes:

Reference is hereby made to that certain consumer product license agreement between Orange County Choppers ("Licensor") and Olaes Enterprises d/b/a ODM ("Licensee") dated March 1, 2003, as amended by a First Amendment dated July 30, 2003, a Second Amendment dated August 2, 2004 and any prior contracts, amendments or modifications related thereto in full force and effort as of the date hereof (collectively the "Agreement"). In consideration of the mutual promises set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Licensor and Licensee hereby agree to amend the Agreement effective to January 1, 2004 as follows ("Third Amendment"):

1. The parties agree as follows: The Agreement shall be amended to acknowledge that OCC licensee Briefly Stated's manufacture, sale, marketing and distribution of intimate apparel and sleep wear related products that in part consist of T-shirts are not in conflict with the definition of Licensed Products as set forth in this Agreement and as such is not in breach or violation of any of the terms hereof, provided that the T-shirts style products (such as but not limited to A-shirts, tank shirts, crew shirts, camisoles, etc.) are however not to be sold individually or as separates and can only be sold to buyers as part of pajama/sleep sets (i.e. one top with one bottom) in the sleepwear, undergarment or intimate apparel departments of retail stores (and not the T-shirt department of retail stores);

2. Except as amended herein, all of the other terms and conditions of the Agreement shall remain in full force and effect. In the event of any inconsistency, incongruity or conflict with the terms of the Agreement, the First Amendment or Second Amendment, the terms and conditions of this Third Amendment shall prevail.

3. This Third Amendment may be executed on one or more counterparts, each of which shall be an original, but all of which together shall constitute one document binding on all parties. Each of the parties agrees that a photographic or fax copy of the signature evidencing a party's execution of this Third Amendment shall be effective as an original signature and may be used in lieu of the original or any purpose.

Please confirm your acceptance of the terms of this Third Amendment to the Agreement as set forth above by **signing** each of the (3) originals in the space provided below and returning each of the original documents to my attention. One fully executed copy will be returned to you for your files. Thank you in advance for your prompt attention to this matter.

Very Truly Yours,
C. Scott Amann

AGREED AND ACCEPTED the terms of this Third Amendment:

Olaes Enterprises, Inc. d/b/a ODM
("Licensee")

By: _Jay Kislevitz_

Print Name: _JAY Kislovitz_

Title: _VP of Licensing_
Date: _7-14-05_

ODM Apparel ULC ("Licensee")
By: _Jay Kislovitz_

Print Name: _JAY Kislovitz_

Title: _VP of Licensing_
Date: _7-14-05_

Orange County Choppers
("Licensor")

By: _Paul Teutul_

Print Name: _Paul Teutul, sr_

Title: _Pres._
Date: _8/3/05_

**EXHIBIT 29**

1