UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————— x

OLAES ENTERPRISES, INC., d/b/a ODM,

Plaintiff,

-against-

A.D. SUTTON & SONS, INC.;
BIO WORLD MERCHANDISING, INC. d/b/a
BIO DOMES HEADGEAR;
BOSTON AMERICA CORP.; BRIEFLY STATED, INC.;
W.R. CASE & SONS CUTLERY;
CLEAN FUN PROMOTIONAL MARKETING, INC.;
C-LIFE GROUP, LTD.; COFFEE LEGENDS, INC.;
DESPERATE ENTERPRISES, INC.;
EVANDALE GIFTS, LLC; HORIZON NY, INC.;
HOUSTON HARVEST, INC.;
INNOVATIVE DESIGNS, LLC; KOLDER, INC.;
STRETCH-O-RAMA, INC. d/b/a LONGSTREET;
UNISYSTEMC, INC.; d/b/a MODERN PUBLISHING;
PLASTICOLOR MOLDED PRODUCTS, INC.;
ROBISON'S, INC. d/b/a/ POWER TRIP;
SPECTORE CORP.; TECHNICRAFT INDUSTRIES, INC.;
THE HUT, LLC; VENDING SUPPLY, INC.;
WHITESIDE MANUFACTURING COMPANY; and
YOU AND ME LEGWEAR, LLC

Defendants-Counterclaim Plaintiffs,

-against-

ORANGE COUNTY CHOPPERS, INC.;
ORANGE COUNTY CHOPPERS
MERCHANDISING, LLC;
and ORANGE COUNTY CHOPPERS LICENSING, LLC,

Counterclaim Defendants.

—————————————————————— x

09 Civ. 8680 (CM) (PED)

DECISION AND ORDER DENYING ALL PENDING MOTIONS FOR SUMMARY
JUDGMENT OR PARTIAL SUMMARY JUDGMENT

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8/6/10

1

McMahon, J.:

## INTRODUCTION

Two enterprises—plaintiffs Orange County Choppers, Inc., Orange County Choppers

Merchandising, LLC, and Orange County Choppers Licensing, LLC (together, "OCC") and

defendant Olaes Enterprises, Inc. ("ODM")— entered into a licensing agreement, pursuant to

which ODM agreed to pay royalties to OCC in return for a license to use OCC's trade name and

trademarks in designing T-shirts and other apparel.  In 2006, OCC commenced this lawsuit,

alleging that ODM had breached the license agreement by failing to pay royalties under the

contract.  (See Civil Action No. 06-cv-7211, Docket No. 1.)  ODM, in turn, asserted a

counterclaim against OCC for infringing on *its* copyrights.  (Id.)  ODM also filed a third-party

complaint alleging copyright infringement against many companies who had licenses with OCC

for the production of other merchandise (the "Licensees").  (Id.)  ODM alleges that the Licensees

marketed and sold "Orange County Choppers" items bearing designs that used ODM's

copyrights without obtaining a license from ODM.  (Id.)

OCC and ODM eventually settled their dispute, without ever adjudicating the issues of

ownership raised by the pleadings.  (See Civil Action No. 06-cv-7211, Docket No. 241.)  ODM

continues to press its copyright infringement claims against the Licensees, who were strangers to

the settlement.

In its agreements with the Licensees, OCC warranted and indemnified them from suit for

their printing and marketing of designs containing copyrighted material that OCC either owned

or controlled.  (OCC's Rule 56.1 Statement ("OCC's 56.1"), ¶ 14; Licensees' Rule 56.1

Statement ("Licensees' 56.1"), ¶¶ 4-5.)  OCC made good on its indemnity for several years,

paying the Licensees' legal fees.  (Report and Recommendation, M. J. Davison, Docket No.

2

135.) But when OCC settled with ODM, it ceased paying for the Licensees' defense and took the position that it was not actually obligated to indemnify them because they were using ODM's copyrights in addition to OCC's copyrights (which they plainly had permission, under their License Agreements, to use). (Id.)

The Licensees have now sued OCC for breach of the indemnification agreements. The Court has consolidated the case with ODM's third-party action against the Licensees for copyright infringement.

There are two sets of motions presently before the Court.

The Licensees and OCC have crossed moved for summary judgment on the issue of indemnification. (Docket Nos. 66, 74.) Those motions are denied.

ODM has moved for summary judgment against the Licensees in its suit for copyright infringement on two elements of its copyright infringement claim: (1) ODM's ownership of copyrights in 28 works; and (2) ODM's registration of those copyrights. Since making that motion, ODM has settled or obtained default judgments against most of the Licensees. Two defendant Licensees—Houston Harvest, Inc., and Vending Supply, Inc.—oppose ODM's motion (Docket Nos. 97, 90), and two more, Spectore Corp. and The Hut, LLC, have defaulted (Docket No. 117 Ex. 1). The motion as against these four Licensees is denied.

## BACKGROUND

While OCC and ODM are no longer in litigation, their dispute remains at the center of this litigation. Accordingly, the Court recites the history of these lawsuits, borrowing liberally from the decision of my predecessor on the matters, The Hon. William C. Conner. Orange County Choppers, Inc. v. Olaes Enterprises, Inc., 497 F. Supp. 2d 541, 553 (S.D.N.Y. 2007) ("Orange County Choppers"). Although Judge Conner's decision came on a motion to dismiss

3

the complaint, and this court is presently considering motions for summary judgment, his

recitation of the relevant facts sets the stage for the decision that follows.

OCC is a well-known custom motorcycle manufacturer and is featured on "American

Choppers," a reality television show on the Discovery Channel. Orange County Choppers, 497

F. Supp. 2d at 546. It also sells apparel featuring its trade name and logos, including T-shirts,

hats, sweatshirts and sunglasses. Id. ODM is a graphic design company that creates, markets

and sells graphic designs and artwork incorporating companies' trade names and trademarks in

accordance with various licensing agreements. Id. It has worked with hundreds of licensors,

including companies such as General Motors and Corona Beer. Id.

On March 1, 2003, OCC and ODM entered into a "Consumer Product License

Agreement" (the "Agreement"). Id. The Agreement envisioned that ODM would enhance

OCC's logos, name and designs ("OCC Property") with graphic designs produced by ODM. See

id. To the extent that ODM's graphics *could not* be separated from the OCC Property, OCC was

to acquire all rights in ODM's work, including any trademarks or copyrights. See id. at 548. To

the extent that ODM's graphics *could* be separated from the OCC Property, the copyrights in the

enhancements remained the property of ODM ("ODM Property"). See id.

OCC in turn entered into licenses with third parties (the Licensees), who were engaged to

make everything from children's pajamas to scratch-off tattoos. Id. at 546. Pursuant to those

licensing agreements (the "License Agreements," about which more will be said shortly), OCC

transferred intellectual property to the Licensees so that the Licensees could emblazon that

property onto their products. (Licensees' 56.1 ¶ 1; OCC's 56.1 ¶ 1.) Needless to say, some of

the designs OCC gave to the Licensees incorporated ODM's graphic enhancements.

4

The original lawsuit between OCC and ODM concerned which aspects of ODM's graphics belonged to OCC and which to ODM under their Agreement. Orange County Choppers, 497 F. Supp. 2d at 546. ODM and OCC have settled that dispute. Now, ODM maintains that the Licensees are infringing on its copyrights by making the products that OCC licensed them to create using the intellectual property that OCC provided.

The Licensees deny that they were infringing ODM's copyrights, claiming that all they did was apply the designs that OCC provided to them onto products, all pursuant to their License Agreement (to which ODM was a stranger). They have turned to OCC and demanded indemnification against ODM's claims, which they claim is required under the terms of their License Agreements.

**DISCUSSION**

**I.      Standard of Review**

Summary judgment may be granted only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under New York law, to establish a breach of contract a plaintiff must plead and prove the following elements: (i) the existence of a contract; (ii) breach by the other party; and (iii) damages suffered as a result of the breach. See First Investors Corp. v. Liberty Mut. Ins. Corp., 152 F.3d 162, 167 (2d Cir. 1998). Summary judgment is appropriate in a breach of contract action where the language of the contract is unambiguous, and reasonable persons could not differ as to its meaning. See Fulton Cogeneration Ass'n. v. Niagara Mohawk Power Corp., 84 F.3d 91, 98 (2d Cir. 1996). Contract language is unambiguous when it has "'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable

5

basis for a difference of opinion.'" Hunt Ltd. v. Lifschultz Fast Freight, Inc., 889 F.2d 1274,

1277 (2d Cir. 1989) (quoting Breed v. Ins. Co. of N. Am., 46 N.Y.2d 351, 413 (1978)).

## II.    The Motions Relating to Indemnification

### A.    Relevant Facts

The Licensees assert that OCC must indemnify them against ODM's claims of copyright

infringement of ODM Property and pay for their defense.  (Licensees' 56.1 ¶ 8.)  They have sued

OCC for breach of contract, and seek summary judgment in their favor.  Of the 25 Licensees

initially party to this suit, 17 have moved for summary judgment.[1]

Cross-moving for a summary adjudication of no breach, OCC counters that its

agreements with Licensees only require indemnification for claims against what it describes as

"OCC Property," not ODM Property.  (OCC's Mem. in Supp. of Mot. for Partial Summ. J.

("OCC Mem."), at 8.)

OCC licensed the Licensees pursuant to two different forms of agreement.  The parties

refer to these as "Group I" and "Group II" agreements, and the Court will as well.  The relevant

language in the Group I License Agreement defines the intellectual property covered by the

Agreement as follows:

> (f) The term "Copyrights" shall mean all copyrights now or hereafter owned or controlled by Licensor relating to the Property.
>
> (k) The term "Intellectual Property" shall mean the Trademarks, Copyrights, and other proprietary rights, except as specifically noted to the contrary in this Agreement, owned or controlled by Licensor relating to the Property, which includes, by way of example and not limitation, rights related thereto such as . . . *rights in design* . . .

---

[1] Those Licensees moving for summary judgment are: A.D. Sutton & Sons, Inc.; Bio World Merchandising, Inc., d/b/a Bio Domes Headgear; Boston America Corp.; Briefly Stated, Inc.; W.R. Case & Sons Cutlery; C-Life Group, Ltd.; Horizon NY, Inc.; Houston Harvest, Inc.; Innovative Designs, LLC; Stretch-O-Rama, Inc. d/b/a Longstreet; Unisystems, Inc. d/b/a Modern Publishing; Plasticolor Molded Products, Inc.; Robison's, Inc. d/b/a/ Power Trip; Technicraft Industries, Inc.; Vending Supply, Inc.; Whiteside Manufacturing Company; and You and Me Legwear, LLC.

(r) The term "Property" shall mean the names, logos and designs currently *owned or controlled* by Licensor related to Orange County Choppers, *which includes the Intellectual Property inherent therein and appurtenant thereto* but specifically excludes any Animated Versions . . .

(w) The term "Trademarks" shall mean the symbols, designs, styles, emblems, logos, and marks now or hereinafter *owned or controlled by Licensor* relative to the Property.

(OCC Ex. A at 4, "Sample Agreement for Group I" (emphasis added).)

The analogous Group II License Agreement language says:

(f) The term "Copyrights" shall [contain] certain copyrights now or hereinafter *owned or controlled by Licensor* related to *the Property as approved for use in accordance with the terms hereof.*

(r) The term "Property(s)" shall mean the Trademarks, Name and Likeness Rights and Copyrights currently *owned or controlled by Licensor*, excluding any Animated Versions thereof.

(w) The term "Trademarks" shall mean the symbols, designs, styles, emblems, logos, and marks relative to the Property as described in Exhibit A.

(OCC's Ex. B at 1, "Sample Agreement for Group II" (emphasis added).)

Exhibit A to the Group II License Agreements (there is no corollary list appended to the Group I Agreements) lists the trademarks as the "corporate name and logo," "Orange County Chopper name and logo," "the initials 'OCC'," and "OCC motorcycle design logo." The term "logo" is not further defined.

Both Agreements require the Licensees to submit prototypes of their products to OCC for approval before they are permitted to manufacture them in commercial quantities and sell the licensed products. (OCC Exs. A-B ¶¶ A(2)(b).) The licensed products are also required to contain a copyright notice indicating that the copyright in the design is owned by OCC. (Id. at ¶ F.)

Both Agreements include a number of representations and warranties by OCC as Licensor: (1) that "it has the full right, power, legal capacity and authority to enter into the

7

Agreement, carry out the terms of this Agreement and grant the Licensee the rights and

privileges granted under this Agreement"; (2) that it is "the owner or entity that controls the

Property granted under this Agreement"; and (3) that it "has the authority to license the Property

under this Agreement." (Id. at ¶ G(1).)  In paragraph H(2) (titled "Indemnification"), the Group

I Agreements go on to say:

> To the extent that the Property (and any Intellectual Property inherent therein
> or appurtenant thereto) has not been altered, changed or modified in any way
> from the version approved by Licensor . . . Licensor will indemnify, defend and
> hold Licensee harmless from any and all claims, suits, liabilities, judgments,
> penalties, losses, costs, damages, and expenses resulting therefrom, including
> reasonable attorneys' fees . . . made by third parties against Licensee based solely
> on a claim of right in one or more elements of the Property or any breach of this
> Agreement by Licensor.

The Group II Agreements contain substantially identical language in paragraph H(2):

> Licensor will indemnify, defend and hold Licensee and its [sic] and their
> licensees, successors and assigns . . . harmless from any and all claims, suits,
> liabilities, judgments, penalties, losses, costs, damages, and expenses resulting
> therefrom, including reasonable attorneys' fees . . . made by third parties against
> Licensee arising from (i) challenges to Licensor's authority to license the
> Trademarks within the Territory; (ii) a breach of any representation or warranty
> provided by Licensor herein; or (iii) to the extent that the Trademarks have not
> been altered, changed or modified in any way from the version approved by
> Licensor . . . a claim of right, title or interest in one or more elements of the
> Trademarks.

Pursuant to these Agreements, each of the Licensees received drawings from OCC (either

directly or through an agent) of various designs which they were to apply to their products.  Each

of the 25 Licensees, here suing for indemnification, has submitted a declaration to this effect,[2]

and OCC does not deny that this occurred.  Obviously, a drawing received from the Licensor

qualifies as "the version [of the design] approved by Licensor."  There also does not seem to be

any dispute that it was these very designs that the Licensees incorporated into the  Licensed

---

[2] See Supplemental Declarations of representatives of each of the Licensee Defendants-Counterclaim Plaintiffs,
submitted to the Court on March 5, 2010, as Docket No. 93.

Products—or that they paid OCC royalties for the privilege of carrying out their License Agreements.

As noted above, OCC and ODM sued each other over ownership of the copyright in the graphic enhancements to what is concededly OCC's intellectual property. In its original complaint against ODM, OCC alleged that all the designs and logos at issue consisted entirely of OCC Property, because the rights in any enhancements created by ODM were transferred to OCC, so no "ODM Property" existed. See Orange County Choppers, 497 F. Supp. 2d at 551. Consistent with that position, OCC undertook to indemnify the Licensees after they were sued by ODM. OCC hired independent counsel for the Licensees and—for a time at least—paid those attorneys for their services. OCC also moved to dismiss ODM's counterclaim for copyright infringement on the ground that OCC, not ODM, owned the graphics in question.

Judge Conner denied OCC's motion to dismiss ODM's counterclaim. Id. at 541. Assessing whether the counterclaim stated a cause of action, Judge Conner held that ODM had alleged sufficient facts—starting with the term of its Agreement with OCC that allowed it to retain the copyright in graphics that could be "separated" from OCC's intellectual property—to permit it to try to prove that there existed "ODM Property" in which it could hold copyrights because it was not inextricably interwoven with OCC's names and logos. See id. at 551. Judge Conner went beyond what was strictly necessary to decide a motion to dismiss, and included dicta in his opinion suggesting that ODM might well prevail in its claim that it was entitled to the copyright in the graphic designs (or, at least, in eleven of them). See Orange County Choppers, 497 F. Supp. 2d at 553.

At that point, OCC reached some sort of accord with ODM—leaving its Licensees to defend themselves against ODM's claim of right, title and interest in the graphic design elements

of the logos that the Licensees had been printing—with what they thought was the copyright holder's permission—on the merchandise they were licensed to produce.

Once OCC settled with ODM, it assumed a new posture concerning indemnity. OCC now takes the position that it has no obligation to indemnify the Licensees against ODM's claim of "right, title and interest" in what the Licensees are imprinting on their merchandise, because ODM is not claiming that it holds any copyright in what OCC and ODM have agreed is "OCC Property"—it seeks only to vindicate its interest in the "ODM Property." OCC argues that it warranted and represented only that no one else could claim an interest only in OCC's Property, and since ODM Property is not OCC Property, any warranties and representations—and any corresponding duty of indemnity—does not extend to ODM's challenge to the Licensees. OCC notified the Licensees of its change of position in letters dated October 12, 2009. (Licensees' Ex. 22 (Affirmation of Jonathan P. Harvey, former attorney for the Licensees), ¶ 4.) OCC has not paid attorneys' fees for the Licensees going back some months earlier, which led to the resignation of counsel for the Licensees (Docket No. 4), and a motion for an award of fees, which is presently pending (Docket No. 72).

**B.    Conclusion of Law**

The Licensees may well be entitled to indemnity for any costs or judgments they have incurred in the ODM litigation. However, their motion for summary judgment on the issues of indemnification and breach of contract to indemnify cannot be granted, because the record at present is incomplete and because certain relevant contractual provisions are ambiguous.

The License Agreements between OCC and its Licensees define the licensed intellectual property (copyrights and trademarks) as copyrights and trademarks that are "owned or controlled" by OCC. (OCC Exs. A-B ¶¶ 1(r).)

10

The issue of OCC's *ownership* of the intellectual property that ODM now claims depends on whether ODM-generated graphics can or cannot be "separated" from the intellectual property that OCC concededly owns: its name, initials, logos (whatever that means[3]) and other identifying service and trademarks. If yes, then ODM is not only the author of those graphic elements; it actually "owns" the copyright in those elements as per the terms of its contract with OCC. But if the graphics cannot be separated from OCC's intellectual property, then ODM does not, under the terms of the OCC/ODM Agreement, "own" those copyrights—even if it is the author of the graphic designs, and even though it purported to register the copyrights in its name. (Licensees' Exs. ¶¶ A(1)-C.)

OCC and ODM settled their dispute before the issue of whether ODM-generated graphics could be "separated" from OCC's intellectual property was finally decided. It is true that Judge Conner, in the context of denying OCC's motion to dismiss the copyright infringement counterclaims against it, opined that ODM's graphic designs could be "separated" from the OCC Property (at least as to the eleven designs that were appended to the parties' pleadings). He also opined that these separable designs contained material that was independently copyrightable. However, my learned mentor was not deciding a motion for summary judgment when he made these observations; he was merely deciding whether or not to dismiss ODM's allegations of copyright infringement against OCC for failure to state a claim. In that context, his statements about the separability of ODM' work from OCC's marks indicate only that ODM had pleaded enough facts to give it the right to take its allegations beyond the pleading stage. To the extent

---

[3] Notwithstanding its root in the Greek word that means "word," the Court understands (and the dictionary confirms this understanding) that "logos" can include graphic elements—symbols and/or signs artwork—as well as words. That this was the parties' understanding is borne out by the fact that, at least in the Group II License Agreements, Exhibit A (a list of OCC's trademarks) includes a motorcycle design "logo" as well as "logos" generally.

11

that they went further, they were mere dicta, intimiting his view of a matter that would ultimately be decided by a trier of fact.

The settlement between OCC and ODM resolves the ownership issue as between them. But it does not constitute an adjudication of whether, as a matter of the contract between OCC and its Licensees, OCC or ODM "owned" the design elements that were provided to the Licensees. That is a function of the original contract between OCC and ODM, which means it cannot be determined without resolving the issue of separability. The OCC/ODM settlement is not binding on the Licensees, who were not parties to it. The Licensees have an independent right to adjudicate whether OCC owns or controls the copyrights in the graphics under the OCC/ODM Agreement—not only to resolve the issue of indemnification under *their* contracts (which turns out to be a function of separability under the OCC/ODM contract), but also to resolve the issue of whether the presumption of copyright ownership that attaches to registration with the Copyright Office is overcome by fraud on the Copyright Office (about which more will be said later).

Because adjudication of ODM's counterclaim never went beyond the motion to dismiss stage, former adjudication principles like collateral estoppel and res judicata (which ODM appears to invoke) do not apply to Judge Conner's decision. This is true even though it appears that some, or perhaps all, of the Licensees joined in OCC's motion and its arguments.

Collateral estoppel requires, inter alia, that an issue be actually litigated and decided in a prior proceeding, after a full and fair opportunity to contest it; and also that the issue was a necessary element of a valid and final judgment on the merits.  Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A., 56 F. 3d 359, 368 (2d Cir. 1995). A settlement does not create collateral estoppel, even between or among the parties to the settlement, unless it is clear

that the parties intended it to—and that requires stipulating to findings of fact, which did not

occur here.  Arizon v. California, 530 U.S. 392, 411 (2000); Marvel Character, Inc. v. Simon,

310 F.3d 280, 291 (2d Cir. 2002).  In any event, a settlement between ODM and OCC does not

bind the Licensees, who had no opportunity to litigate an issue that, as it turns out, was as

important to them as it was to OCC.  See 1892 Caton Realty v. Caton BMT Assoc., 225 A.D. 2d

599 (2d. Dep't 1996).

 The record before this Court contains registration certificates for the eleven graphics that

were also before Judge Conner.  In connection with the instant motion for summary judgment, I

have reviewed those pictures.  After examining the graphics myself, I conclude that the issue of

whether they are separable from OCC's logos, names and marks raises a genuine issue of fact

that will have to be submitted to a jury at trial.  The fact that ODM did not itself "separate" the

graphics from OCC's marks, but instead registered the entire design without specifying that it

was claiming copyright in just part of the design, may not be irrelevant to the resolution of this

question.

 Of course, "ownership" of the copyrights is not dispositive of the question.  As long as

OCC "controlled" the copyright or the trademark in those design elements—even if they were

"owned" by ODM—the design elements fell within the definition of "Property," "Intellectual

Property" (Group I Agreement only), "Copyright" and "Trademark" in the Group I and Group II

License Agreements.  And if the design elements qualified as "Property," "Intellectual

Property," "Copyright" or "Trademark," then OCC warranted and represented that it could

license those elements—and is bound to indemnify the Licensees.

 The Licensees note that Judge Conner engaged in an extensive discussion about OCC's

control of ODM's design work:

13

> The Agreement provided OCC the right to approve all designs proposed
> by ODM prior to distribution. Specifically, OCC could disapprove a
> proposed design if, "in its sole and unfettered discretion," it would
> "impair the value and goodwill" of OCC Property. Moreover, OCC had
> the right to disapprove a proposed design for any "reasonable cause,"
> including if it did not satisfy the general quality standards of OCC, failed
> to accurately depict OCC Property, was unethical, immoral or offensive
> to good taste, or failed to carry proper copyright, trademark or other
> required notices. . . . "In the event [OCC] fail[ed] to approve or
> disapprove of any materials submitted . . . within twenty days after [its]
> receipt of such materials . . ., the materials [were] automatically deemed
> disapproved."

Orange County Choppers, 497 F. Supp. 2d at 547 (omitting internal citations to OCC's

Agreement with ODM). The contract provisions discussed by Judge Conner certainly gave OCC

control over the *design process*. However, the issue for this Court is whether these provisions, or

any others in the OCC/ODM contract, gave OCC control over ODM's *copyrights*, not just over

the *designs*. Whether control over the designs also controls the copyright depends on what the

parties meant by "control"—a term that is at best ambiguous in the context of the OCC/ODM

contract. That issue of contract construction, too, must be submitted to a jury, which needs to

hear evidence on the meaning of "control" from the persons who negotiated and drafted the

Agreements, as well as from persons who carried it out.

    In short, it is not enough for OCC to say that it is required to indemnify the Licensees

only for claims of right in OCC Property, and that by virtue of its settlement with ODM it has

conceded that the graphic elements in the Orange County Choppers designs are not OCC

Property, but are ODM Property. OCC may have abandoned its claim to the graphics, but the

Licensees have the right to assert that OCC, for reasons of its own, settled in derogation of its

own contract rights, and that ODM either did not "own" or "control" the graphic designs it

created when they were given to the Licensees. Put otherwise, they have the right to pursue the

issues of ownership and control that OCC abandoned.

14

The Licensees argue that they signed a contract pursuant to which they obtained a license to place OCC-approved designs on all manner of merchandise; that OCC not only approved the designs that are now alleged to infringe on ODM's rights, it actually supplied those designs to the Licensees; and that by so doing, it represented to the Licensees that these very designs were the "property" that it "owned" and was "licensing" pursuant to a warranty that provided that "the rights granted in this Agreement will not knowingly violate or infringe upon the rights of any third persons or parties." (Group I Agreement ¶ G(1); Group II Agreement ¶ G(1).)  The Licensees also point out that they paid OCC royalties for the use of the OCC-supplied "designs." (Licensees' Mem. in Supp. of Mot. for Summ. J. at 7.)

OCC responds to the Licensees' contentions by asserting that the terms "Property," "Intellectual Property," "Copyright" and "Trademark" as used in the Group I and Group II License Agreements are defined with reference to issues of ownership and control of intellectual property, not with reference to approved drawings; and that its warranties and representations to the Licensees (and its specific agreement to indemnify) extends only to "Property" and "Trademarks" as defined in the Group I and Group II Agreements.  (OCC's Mem. in Resp. to Mot. for Summ. J. at 3.)

I believe that what the Licensees are arguing here (even though they do not quite come out and say it) is that, even if OCC did not "own" or "control" the intellectual property rights to the graphic designs at issue within the meaning of their License Agreements, it should nonetheless be estopped from assertinbg that it did not own or control them—because it supplied the Licensees with the designs that contained ODM Property—and so it should be estopped from invoking the literal definitions of types of "property" contained in the Agreements as a ruse to escape its otherwise-applicable indemnity obligations.

15

Based solely on the incomplete record presently before the Court, I can see considerable merit in such an argument. It is settled as a matter of undisputed fact that the Licensees were provided with drawings or designs that they were expected to incorporate into their products.[4] The Standard Terms and Conditions attached to the Group I Agreement and the Group II Agreement plainly state that "all designs of the Licensed Product, including drawings, artwork, photographs, sketches, layouts, patterns and material compositions . . . are developed for the sole benefit of Licensor and *any and all proprietary interests and ownership rights related to any design belong exclusively to Licensor*." (Group I Agreement ¶ E(2); Group II Agreement ¶ E(2)(emphasis added).) That clause does not mention ODM, or suggest that portions of the proprietary interests and ownership relating to any "design" might not actually belong to OCC. Furthermore, the License Agreements also required the Licensees to place a copyright notice (© Orange County Choppers) on any products created using the Licensed Property. (Group II Agreement ¶ F). It does not require the Licensees to acknowledge any copyrights owned by ODM.

Finally, and of critical importance, it is perfectly clear, from the position that OCC took from the outset of its litigation with ODM up until the moment when Judge Conner denied its motion to dismiss the counterclaims, that OCC did not believe that its intellectual property consisted only of the letters "OCC" or "ORANGE COUNTY CHOPPERS," shorn of the vibrant graphics that were probably the principal reason why a customer would want to wear a licensed T-shirt or tattoo in the first place. OCC's behavior through the first three years of this litigation demonstrates that it plainly believed, when it entered into the License Agreements with the

---

[4] Different Licensees may have received different drawings or designs, so as to each Licensee the issue of separability would have to be analyzed.

16

Licensees, that it owned what may actually be ODM Property. This conclusion is reinforced by the fact that it provided for Licensees' legal defense for more than two years.

However, the record does not include all the information that would be necessary to dispose of the Licensees' estoppel argument. For example, none of the evidence reveals whether any of the Licensees were made aware of OCC's arrangement with ODM concerning graphics,[5] even though it now appears that the OCC/ODM arrangement was (or may have been) relevant to their own License Agreements with OCC. There is no evidence one way or another in the present record about whether the Licensees were told that they would have to obtain licenses from ODM in order to carry out their obligations under the License Agreements (which, if ODM actually owns the so-called ODM Property, would have been necessary). The record is also barren of evidence (one way or the other) concerning what *was* said by OCC when it transmitted the images to its Licensees; those statements, whether written or oral, are surely relevant to the argument suggested by the Licensees. For example, if the images were transmitted to the Licensees together with a cover letter, or email, and if that letter or email did not disclose that only portions of the drawings were the "Property" or "Copyrights" or "Trademarks" of OCC within the meaning of the Group I and Group II Agreements, then the Licensees would have a much stronger argument for estoppel.[6]

Finally, the parties have not briefed the law on this issue, even though an estoppel is what is fairly implied by the Licensees' arguments. Until this argument is fully fleshed out, the Court

---

[5]The Group I License Agreement that is attached to OCC's papers as Exhibit A includes references to ODM, but as another Licensee, for the creation of Orange County Choppers T-shirts—not as the creator of graphic designs. (OCC Ex. A ¶ 2(a)(i).)

[6]Individual Licensees may actually be in different positions with regard to these issues, because different people may have been told—or not told—different things.

17

cannot possibly rule on it, one way or the other.[7]

For these reasons, the Licensees' motion for summary judgment on the issue of indemnification must be denied. However, OCC is certainly not entitled to summary judgment, either. On the contrary, it appears to this Court that the Licensees may well have the better of the argument when the record and the legal arguments are fully developed—not to mention that they may well have the better of any equitable argument that may prove relevant.

## III.    ODM's Motion for Partial Summary Judgment on Copyright Issues Against Licensees

ODM alleges that the Licensees who have not settled with it (Evandale Gifts, LLC., Houston Harvest, Inc.; The Hut, LLC; and Vending Supply, Inc., collectively, the "Licensee Defendants") are liable for infringing its copyrights.[8]  Arguing that (1) ODM is the "owner" of the copyright in 28 designs that Licensee Defendants allegedly infringed on, and (2) ODM registered the copyrights for the 28 designs that these defendants allegedly infringed, ODM moves for partial summary judgment on these two elements of its copyright claim.  That motion is denied.

---

[7]The Licensees ask the Court to analogize this case to a sale of goods case governed by the Uniform Commercial Code and to find some sort of Implied Warranty of Title and Against Infringement analogous to the one found in UCC § 2-312.  It is not necessary to address this argument at this time.

[8]There appears to be some confusion over who remains and who does not remain a party to this suit.  In a letter to the Court dated July 26, 2010, counsel for Houston Harvest stated that there are only two remaining defendants to ODM's claims, Houston Harvest, Inc. and Vending Supply, Inc.

The Court notes that ODM requested default judgments against Evandale Gifts and The Hut LLC on February 9, 2010. (Docket Nos. 70-71.)  A Certificate of Default was apparently issued by the Clerk of the Court on February 17, 2010 for The Hut LLC. (Docket No. 117.)  No Certificate of Default can be found in the record for Evandale Gifts.  No motion has been made to enter a default judgment on either The Hut LLC or Evandale Gifts.  Accordingly, the Court considers them parties to this suit.  Therefore, there remain four defendants to ODM's claim: Evandale Gifts; Houston Harvest, Inc.; The Hut LLC; and Vending Supply, Inc.

Evandale Gifts and The Hut LLC did not respond to ODM's motion.  However, the Second Circuit has held that an unopposed motion for summary judgment cannot be granted as a default judgment.  Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 242 (2d Cir. 2004) ("We hold that Fed. R. Civ. P. 56, governing summary judgment motions, does not embrace default judgment principles.  Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.")  Accordingly, ODM's motion for summary judgment is considered on the merits as against all four remaining defendants.

It is undisputed that ODM "created and registered" 28 designs relating to OCC with the Copyright Office. (ODM's 56.1 ¶ 11; Kopelowitz Decl. Ex. 1-28.) ODM is certainly entitled to summary judgment on the discrete issue of registration. Ownership, however, is another matter.

For all the reasons set forth above, ODM is not entitled to summary judgment on the issue of ownership. In this case, whether ODM actually owns the copyrights in the graphic designs depends on whether the graphics can be "separated" from the trademarks and logos of OCC—an issue on which this Court has opined that reasonable minds could differ, and that must be sorted out, design by design, by a jury.

A certificate of registration from the Copyright Office constitutes prima facie evidence of the valid ownership of a copyright, although that presumption of ownership may be rebutted. See Rogers v. Koons, 960 F. 2d 301, 306 (2d Cir. 1992); Folio Impressions v. Byer Calif., 937 F. 2d 759, 763 (2d Cir. 1991).

ODM asserts that the presumption of ownership has not been and cannot be rebutted because its designs *can* be separated from OCC's marks; in fact, it considers that issue already decided, citing Judge Conner's opinion denying OCC's motion to dismiss. But as explained above, Judge Conner was deciding only a motion to dismiss, and his statements about separability are mere dicta. Furthermore, the Licensees have an independent right to litigate the issue of separability—since that issue is a prerequisite to an issue of contract interpretation in their contracts with OCC—and they are not collaterally estopped from doing so by anything in Judge Conner's very preliminary decision.

Both Houston Harvest and Vending Supply, Inc. challenge ODM's ownership of the copyrights at issue, and they urge the Court to conclude that summary judgment would be premature until they have had an opportunity to take discovery on the issue. They have moved

19

under Fed. R. Civ. P. 56(f) for leave to take additional discovery. That motion is effectively

mooted by this opinion. The defendant Licensees have a right to take discovery on all issues

relating to the ownership of the copyrights (issues both contractual and, apparently, artistic), as

well as on the issue of OCC's control over any copyrights that may have been owned by ODM,

which presents another basis for concluding that OCC was required to indemnify the Licensees.

Finally, if it were determined that ODM omitted crucial information, or submitted false

information in its copyright registration applications (such as information about the impact of its

contract with OCC on the issue of copyright ownership), then ODM's copyrights may be invalid,

regardless of its registration of the designs. See Whimsicality, Inc. v. Rubie's Costume Co., Inc.,

891 F.2d 452, 455 (2d Cir. 1989). It does not appear, from the face of the registrations, that

ODM disclosed anything about the OCC contract—which is determinative of ownership—to the

Copyright Office. Whether that constituted a misrepresentation depends on whether the graphic

designs can be separated from OCC's intellectual property—an issue that is going to trial. Until

that issue is decided, ODM has not established and cannot establish that there is no genuine issue

of fact or that it is entitled to judgment on its claim to ownership in the copyrights as a matter of

law.

## CONCLUSION

For the reasons set forth above, all pending motions for summary judgment or partial

summary judgment are denied, as is the Rule 56(f) motion asserted by the remaining Licensees.

The Clerk of the Court is directed to remove the motions at Docket Nos. 66, 74, 81 and 99 from

the Court's list of pending motions.

The Court will permit 90 days for additional discovery consistent with this opinion. At

the end of those 90 days, I want to try the issue of indemnity as quickly as possible. Because of

20

the congested state of my criminal docket, I strongly urge OCC and the Licensees to consent to trial before Magistrate Judge Davison. I believe that resolution of this issue in the short term is critically important—if only because I cannot decide the pending motion for reimbursement by Licensees' former counsel (Docket No. 72) until it is resolved.

I am advised that there are settlement talks, and even mediations, ongoing between ODM and the remaining defendants. I will defer setting ODM's copyright infringement case for trial until we see whether those talks are fruitful.

This constitutes the decision and order of this Court.

Dated: August 6, 2010

_____
U.S.D.J.

BY ECF TO ALL COUNSEL
BY FAX TO MAGISTRATE JUDGE DAVISON