UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

OLAES ENTERPRISES, INC., d/b/a ODM,

      Plaintiff,

  -against-

A.D. SUTTON & SONS, INC., et al.,

      Defendants-Counterclaim Plaintiffs,      09 Civ. 8680 (CM)(PED)

  -against-

ORANGE COUNTY CHOPPERS, INC.,
ORANGE COUNTY CHOPPERS
MERCHANDISING LLC, and ORANGE
COUNTY CHOPPERS LICENSING LCC,

      Counterclaim Defendants.

--------------------------------------------------------------x

MEMORANDUM ORDER GRANTING COUNTERCLAIM PLAINTIFFS' REVISED
MOTION FOR PARTIAL SUMMARY JUDGMENT, ACCEPTING THE REPORT OF THE
HON. PAUL E. DAVISON, U.S.M.J. INSOFAR AS IT RECOMMENDS GRANTING THE
MOTION OF JONATHONA P. HARVEY LAW FIRM, PLLC, FOR ATTORNEYS' FEES
AND ADOPTING THE REPORT AS THE OPINION OF THE COURT

McMahon, J.:

      The Counterclaim Plaintiffs are former Licensees of the Counterclaim Defendants ("Licensees"). Counterclaim Defendants (hereinafter "OCC") were sued in 2006 by Olaes Enterprises (sub nom ODM, and henceforth referred to by either name) for copyright infringement, predicated on the use in OCC-licensed products of certain artistic enhancements to OCC logos allegedly copyrighted by Olaes. The Licensees were also sued for infringement.

In the licensing agreements between OCC and its Licensees, OCC warranted and represented that it owned certainly "Property" that it was (ostensibly) authorizing the Licensees to imprint on various consumer goods (like tee shirts). The agreements also included an indemnification provision, which -- with modest wording variations that do not alter their substance -- required OCC to indemnify the Licensees for damages and reasonable legal expenses incurred in defending against a claim of precisely the sort that ODM/Olaes brought against them. As a result, the Licensees brought cross claims for indemnification against the OCC Entities.

From the outset of this case[1], OCC, based on what it termed its "preliminary investigation," told its Licensees that they would be indemnified against loss in this lawsuit pursuant to these clauses. OCC hired attorneys to represent the Licensees; while each Licensee signed a retainer agreement with the attorneys, OCC (through defendant Orange County Choppers Merchandising) countersigned each retainer agreement. Retainer agreements were entered into with two firms: Tabner, Ryan & Keniry, which has no application before this Court, and the Jonathon P. Harvey Law Firm (JPH), which was brought into this action as a result of potential conflicts on or about February 1, 2008. As noted by the Magistrate Judge's Report, in connection with the retainer agreements with JPH, OCCM paid the retainer fee and agreed to pay all fees and disbursements in the matter in excess of the retainer fee.

OCC paid the legal bills of the Licensees relating to this action until my esteemed colleague, the Hon. William C. Conner, denied its motion to dismiss Olaes' copyright claims – in an opinion that strongly suggested that OCC might well lose the case. It then reneged on the

---

[1] "This case" includes both this docket number and a predecessor case, Docket No. 06 Civ. 7211 (WCC). As one of its first acts, this court severed the claims relating to the Licensees – both Olaes' claims against the Licensees and the Licensees' cross claims against OCC – and gave them a new docket number, 09 Civ. 8680. The original docket number was reserved for the cross claims asserted by Olaes (sub nom ODM) and OCC against each other.

arrangement, insisting that it had no contractual obligation to indemnify. The court was unable to grant either side summary judgment on the issue of indemnification, and in an opinion issued August 6, 2010, I directed discovery and a trial on certain limited issues.

Instead, after all of the Licensees settled with Olaes, the Licensees have renewed their motion for indemnification, addressing certain record deficiencies that prevented the court from granting the original motion. OCC has defaulted on the motion, so all of the allegations of undisputed fact set forth in the Licensees' Rule 56.1 Statement are deemed true. See Versace v. Versace, 2003 WL 22023946, at *1 (S.D.N.Y. 2003) (citing Gubitosi v. Kaqpica, 154 F.3d 30, 31 n. 1 (2d Cir. 1998)).

I now grant the motion for indemnification.

**A.    Relevant Facts**

The Licensees assert that OCC must indemnify them against ODM's claims of copyright infringement of ODM Property and pay for their defense. They have sued OCC for breach of contract, and seek summary judgment in their favor. Of the 25 Licensees initially party to this suit, 12 have signed onto the present motion.[2] The non-moving Licensees are in no different posture than are the movants.

OCC licensed the Licensees pursuant to two different forms of agreement. The parties refer to these as "Group I" and "Group II" agreements, and the Court will as well. The relevant language in the Group I License Agreement defines the intellectual property covered by the Agreement as follows:

---

[2] Those Licensees moving for summary judgment are: Bio World Merchandising, Inc., d/b/a Bio Domes Headgear; Briefly Stated, Inc.; W.R. Case & Sons Cutlery; C-Life Group, Ltd.; Houston Harvest, Inc.; Innovative Designs, LLC; Stretch-O-Rama, Inc. d/b/a Longstreet; Unisystems, Inc. d/b/a Modern Publishing; Plasticolor Molded Products, Inc.; Robison's, Inc. d/b/a/ Power Trip; Vending Supply, Inc.; and Whiteside Manufacturing Company.

(f) The term "Copyrights" shall mean all copyrights now or hereafter owned or controlled by Licensor relating to the Property.

(k) The term "Intellectual Property" shall mean the Trademarks, Copyrights, and other proprietary rights, except as specifically noted to the contrary in this Agreement, owned or controlled by Licensor relating to the Property, which includes, by way of example and not limitation, rights related thereto such as . . . *rights in design* . . .

(r) The term "Property" shall mean the names, logos and designs currently *owned or controlled* by Licensor related to Orange County Choppers, *which includes the Intellectual Property inherent therein and appurtenant thereto* but specifically excludes any Animated Versions . . .

(w) The term "Trademarks" shall mean the symbols, designs, styles, emblems, logos, and marks now or hereinafter *owned or controlled by Licensor* relative to the Property.

(OCC Ex. A at 4, "Sample Agreement for Group I" (emphasis added).)

The analogous Group II License Agreement language says:

(f) The term "Copyrights" shall [contain] certain copyrights now or hereinafter *owned or controlled by Licensor* related to *the Property as approved for use in accordance with the terms hereof.*

(r) The term "Property(s)" shall mean the Trademarks, Name and Likeness Rights and Copyrights currently *owned or controlled by Licensor*, excluding any Animated Versions thereof.

(w) The term "Trademarks" shall mean the symbols, designs, styles, emblems, logos, and marks relative to the Property as described in Exhibit A.

(OCC's Ex. B at 1, "Sample Agreement for Group II" (emphasis added).)

Exhibit A to the Group II License Agreements (there is no corollary list appended to the Group I Agreements) lists the trademarks as the "corporate name and logo," "Orange County Chopper name and logo," "the initials 'OCC'," and "OCC motorcycle design logo." The term "logo" is not further defined.

Both Agreements require the Licensees to submit prototypes of their products to OCC for approval before they are permitted to manufacture them in commercial quantities and sell the licensed products. (OCC Exs. A-B ¶¶ A(2)(b).) The licensed products are also required to

contain a copyright notice indicating that the copyright in the design is owned by OCC. (Id. at ¶ F.)

Both Agreements include a number of representations and warranties by OCC as Licensor: (1) that "it has the full right, power, legal capacity and authority to enter into the Agreement, carry out the terms of this Agreement and grant the Licensee the rights and privileges granted under this Agreement"; (2) that it is "the owner or entity that controls the Property granted under this Agreement"; and (3) that it "has the authority to license the Property under this Agreement." (Id. at ¶ G(1).) In paragraph H(2) (titled "Indemnification"), the Group I Agreements go on to say:

> To the extent that the Property (and any Intellectual Property inherent therein or appurtenant thereto) has not been altered, changed or modified in any way from the version approved by Licensor . . . Licensor will indemnity, defend and hold Licensee harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fees . . . made by third parties against Licensee based solely on a claim of right in one or more elements of the Property or any breach of this Agreement by Licensor.

The Group II Agreements contain substantially identical language in paragraph H(2):

> Licensor will indemnify, defend and hold Licensee and its [sic] and their licensees, successors and assigns . . . harmless from any and all claims, suits, liabilities, judgments, penalties, losses, costs, damages, and expenses resulting therefrom, including reasonable attorneys' fees . . . made by third parties against Licensee arising from (i) challenges to Licensor's authority to license the Trademarks within the Territory; (ii) a breach of any representation or warranty provided by Licensor herein; or (iii) to the extent that the Trademarks have not been altered, changed or modified in any way from the version approved by Licensor . . . a claim of right, title or interest in one or more elements of the Trademarks.

Pursuant to these Agreements, each of the Licensees received from OCC (either directly or through an agent) drawings of various designs that they were ostensibly authorzied to apply to their products. Each of the 25 Licensees who originally moved for summary judgment

submitted sworn statements to that effect,[3] and OCC does not deny that this occurred. Obviously, a drawing received from the Licensor qualifies as "the version [of the design] approved by Licensor." There also does not seem to be any dispute that it was these very designs that the Licensees incorporated into the Licensed Products—or that the Licensees paid OCC royalties for the privilege of carrying out their License Agreements.

As noted above, OCC and ODM sued each other over ownership of the copyright in the graphic enhancements to what is concededly OCC's intellectual property. In its original complaint against ODM, OCC alleged that all the designs and logos at issue consisted entirely of OCC Property, because the rights in any enhancements created by ODM were transferred to OCC, so no "ODM Property" existed. See Orange Cnty. Choppers, Inc. v. Olaes Enters., Inc., 497 F. Supp. 2d 541, 551 (S.D.N.Y. 2009). Consistent with that position, OCC undertook to indemnify the Licensees after they were sued by ODM. OCC hired independent counsel for the Licensees and—for a time at least—paid those attorneys for their services. OCC also moved to dismiss ODM's counterclaim for copyright infringement on the ground that OCC, not ODM, owned the graphics in question.

Judge Conner denied OCC's motion to dismiss ODM's counterclaim. Id. at 541. Assessing whether the counterclaim stated a cause of action, Judge Conner held that ODM had alleged sufficient facts—starting with the term of an Agreement between ODM and OCC that allowed ODM to retain the copyright in any graphics that could be "separated" from OCC's intellectual property—to permit it to try to prove that there existed "ODM Property" in which ODM could hold copyrights, because it was not inextricably interwoven with OCC's names and logos. See id. at 551. Judge Conner went beyond what was strictly necessary to decide a motion

---

[3] See Supplemental Declarations of representatives of each of the Licensee Defendants-Counterclaim Plaintiffs, submitted to the Court on March 5, 2010, as Docket No. 93.

to dismiss, and included dicta in his opinion suggesting that ODM might well prevail in its claim that it was entitled to the copyright in the graphic designs (or, at least, in eleven of them). See Orange County Choppers, supra., 497 F. Supp. 2d at 553.

At that point, OCC reached some sort of accord with ODM—leaving its Licensees to defend themselves against ODM's claim of right, title and interest in the graphic design elements of the logos that the Licensees had been printing (with what they thought was the copyright holder's.

As soon as OCC settled with ODM, it took the position that it had no obligation to indemnify the Licensees against ODM's claim of "right, title and interest" in what the Licensees were imprinting on their merchandise. Per their settlement agreement, ODM was not claiming that it held any copyright in what OCC and ODM (but not the Licensees) agreed was "OCC Property"—rather, its (i.e., ODM/Olaes') claims against the Licensees related to what OCC and ODM (but not the Licensee) agreed was "ODM Property." OCC argued that it had warranted and represented to the Licensees only that no one else could claim an interest in OCC's "Property," and since ODM Property is not OCC Property, any warranties and representations— and any corresponding duty of indemnity—did not extend to ODM's claims against the Licensees. OCC notified the Licensees of its change of position in letters dated October 12, 2009. (Licensees' Ex. 22 (Affirmation of Jonathan P. Harvey, former attorney for the Licensees), ¶ 4.) OCC stopped paying attorneys' fees for the Licensees going back some months earlier, which led to the resignation of principal counsel and a motion for an award of fees, which was eventually granted.

In an opinion issued on August 6, 2010, this court announced that the Licensees might well be entitled to indemnity for any costs or judgments incurred in the ODM litigation.

However, their motion for summary judgment on the issues of indemnification and breach of contract to indemnify was not granted because the factual record was incomplete and certain relevant contractual provisions were deemed ambiguous. A second motion for fees, by JPH, was placed on suspense pending resolution of those issues at trial.

The court will not recite the entire 2010 opinion here and assumes that the reader is familiar with it. Suffice it to say that I concluded that the Licensees were effectively arguing that OCC should be stopped to deny indemnification, based on (1) its conduct in supplying the licensed designs to the Licensees; (2) its representation that the designs so supplied were the "property" that it "owned" and was "licensing" pursuant to a warranty that provided that "the rights granted in this Agreement will not knowingly violate or infringe upon the rights of any third persons or parties," (Group I Agreement ¶ G(1); Group II Agreement ¶ G(1).), and (3) its post-suit conduct in actually indemnifying the Licensees until Judge Conner issued his decision. The Licensees also pointed out that they paid OCC royalties for the use of the OCC-supplied "designs," not just for a portion of those designs. While seeing "considerable merit," in an estoppels argument, I concluded that the record was not complete enough to allow me to decide the issue on motion.

After discovery on the issues as to which the record was incomplete, the Licensees have submitted a revised motion for summary judgment, including evidence to fill in the holes in the record on the first motion. OCC – whose corporate witness(es) claimed ignorance on all issues – has no evidence to offer and so has defaulted. As a result all of the Licensees' Statements of Undisputed Fact are deemed admitted.

### B. Legal Conclusions

Addressing particularly the deficiencies noted by the court with respect to the estoppel

argument: it is now crystal clear that OCC never told any of the Licensees about its arrangement with ODM/Olaes, or advised them that ODM had the right to retain ownership over severable improvements it made to the OCC designs/logos, or suggested that the Licensees might have to obtain a separate license from ODM before they placed the designs OCC had provided on their products. Instead, OCC represented to the Licensees that they were free to incorporate the entire design provided into their licensed products. Representatives of the Licensees have sworn to the above, while OCC's witness at deposition claimed that OCC had no corporate recollection of what it had or had not told the Licensees about these matters. Therefore, OCC has no evidence to refute the Licensees' contention that OCC never made them aware of any arrangement with ODM.

There is also no dispute that OCC delivered the designs used by the Licensees to those Licensees in tangible or electronic form, without either any copyright notice or other notice that would have identified ODM as having any proprietary right in the designs. OCC thus led each Licensee to believe that OCC owned the material that was provided for the Licensees' use. Each moving Licensee has sworn that it relied on the fact that OCC provided the designs to it for the purpose for which they were used: incorporation into licensed products with OCC's approval.

On these facts, OCC is equitably stopped to deny its obligation to defend the Licensees and to hold them harmless against Olaes' claims.

Equitable estoppel prevents a party from denying his own expressed or implied admission which has in good faith been accepted and acted upon by another. Airco Alloys Div. Airco Inc., v. Niagara Mohawk Power Corp., 76 A.D.2d 68, 430 N.Y.S. 2d 179, 187 (4th Dept. 1980). The party seeking estoppel must show (1) conduct that amounts to a false representation or concealment of material facts, or that is calculated to convey the impression that the facts are

otherwise than, and inconsistent with, those that the party subsequently seeks to assert; (2) intention, or at least expectation, that such conduct will be acted upon by the party to which the false representation is made or the facts are concealed; (3) knowledge of the actual facts by the party making the representation; (4) lack of knowledge of the actual facts by the party asserting estoppels; (5) reliance on the conduct of the party against which estoppel is sought; and (6) a prejudicial change in position. BWA Corp. v. Alltrans Express U.S.A., Inc., 112 A.D.2d 850, 493 N.Y.S. 2d 1, 3 (1st Dept. 1985).

On the undisputed facts set forth in the Licensees' Rule 56.1 Statement, the Licensees have made out every one of the six elements. The undisputed facts show that OCC knew of its original arrangement with ODM, but did not disclose that arrangement, or suggest that anyone other than itself might have any reason to claim ownership in the licensed designs. They show that OCC, by providing the actual designs and making its representation and warranty of ownership without disclosing ODM's involvement in creating the designs, conveyed the impression that OCC alone could permit the Licensees to emblazon their products with the licensed designs. They show that OCC expected – indeed, wanted – the Licensees to place the licensed designs on their products and introduce those products into the marketplace, so that OCC would receive royalties under the License Agreements. They show that the Licensees did not have a clue about ODM's existence or its relationship to the matters covered by the License Agreements. They show that the Licensees relied on OCC's conduct and warranties and representations in entering into the agreements and in producing what apparently was infringing merchandise.[4] And they show that the Licensees acted to their detriment by producing the merchandise contemplated by the Licensing Agreement and putting it into commerce.

---

[4] I say "apparently" because, as to the Licensees, it has not yet been established that the so-called ODM Property was independently copyrightable, for the reasons set out in my August 6, 2010 opinion.

Furthermore, OCC's conduct in connection with this litigation up until the time Judge Conner refused to dismiss the lawsuit (and opined that OCC might well lose as between it and ODM/Olaes) demonstrates that OCC itself understood its obligation to indemnify the Licensees in this action.

In short, regardless of whether ODM/Olaes has any rights in what OCC has come to call the "ODM Property," OCC is stopped to deny any contractual obligation to indemnify the Licensees in connection with this lawsuit.

For substantially the reasons stated in the moving brief, the court also agrees that OCC breached an implied warranty of title analogous to the sort of breach outlawed by UCC § 2-312 and so must indemnify the Licensees on this basis as well.

As to all Licensees except Robison, the motion to enforce the indemnity is granted.

Robison by its own admission presents a more difficult case, because it entered into a Termination and Release Agreement with OCC in January 2006, which ended the License Agreement and by its terms released each party from any claims arising out of the License Agreement. That would appear to bar Robison from asserting this claim.

However, OCC treated Robinson no differently in practice from any other Licensee. It told Robison that it would indemnify it and for the first 33 months of the pendency of Olaes' lawsuit it did indemnify Robison; indeed, OCC's Paul Teutul sent a letter to Randy Robison on February 8, 2008 in which OCC agreed to pay Robison's legal fees. Additionally, Robison, like all of the other defendants, was required to sign a retainer agreement with counsel chosen for it by OCC. OCC, through Paul Teutul, countersigned this retainer agreement, thereby agreeing with the attorney to be responsible for Robison's legal bills. Robison is the third party beneficiary of OCC's agreement with counsel. See Consol. Edison, Inc. v. Ne. Utils., 426 F.3d

524, 527 (S.D.N.Y. 2005). Both the letter and the Retainer Agreement post-date the termination and release mentioned above. In particular, the retainer letter represents a new agreement by OCC to be responsible for Robison's legal bills.

Furthermore, OCC failed to plead "release" as an affirmative defense to Robison's cross-claim for indemnification in the original action, either in its original Reply (Docket #125) or its Recond reply (Docket # 153). By failing to plead release, OCC has waived the defense. Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party *must* affirmatively state any avoidance or affirmative defense, including……release…..); Doubleday & Co. v. Curtis, 763 F. 2d 495, 503 (2d Cir. 1985).

Therefore, Robison's motion for partial summary judgment is granted as well.

The matter is referred to The Hon. Paul E. Davison, U.S.M.J. for an inquest on damages.

Dated: June 20, 2011

_____
U.S.D.J.


BY ECF TO ALL COUNSEL

BY FAX TO MAGISTRATE JUDGE DAVISON